## Boyd *v.* Conshohocken Worsted Mills, Appellant.

*Pledgor and pledgee—Stock—Dividends.*

Where stock held as collateral stands in the name of the pledgee, he is entitled to the dividends; and where such dividends have been paid to the pledgor without the knowledge or consent of the pledgee, he may sue the company so having paid them for the amount thereof; and this is so even where after the dividends have been so declared and paid, the pledgor pays part of the debt and the pledgee surrenders the old collateral note and takes a new one with more stringent terms for the balance, both notes pledging the stock as collateral and the stock continuing in the name of the pledgee, if the new note is taken as a part renewal of the old one; and whether or not it is so taken is a question for the jury.

*Evidence—Cross-examination—Party to suit.*

Cross-examination must be confined to the matter of the examination in chief; and this rule applies where a party to the suit is the witness.

*Party called as if under cross-examination—Act of May 23, 1887.*

A party to a suit whose testimony would be excluded under clause (*e*) of § 5 of the act of May 23, 1887, by reason of the death of the other party

to the contract in action, who is called by the adverse party as if under cross-examination under § 7 of said act and examined as to matters occurring in the lifetime of the deceased, is thereby rendered a competent witness for himself as to all relevant matters : Corson's Est., 137 Pa. 160.

Argued Feb. 5, 1892.    Appeal, No. 175, Jan. T., 1892, by defendant, from judgment of C. P. Montgomery Co., March T., 1891, No. 133, on verdict for plaintiff, Augustus Boyd.    Before PAXSON, C. J., McCOLLUM, MITCHELL and HEYDRICK, JJ.

Assumpsit to recover dividends on stock.

On the trial, before SWARTZ, P. J., the plaintiff proved his ownership of 300 shares of the stock of the defendant company and the declaration of the dividends in November of 1884, 1885 and 1886 ; and then testified that he had never received the dividends but had demanded them May 31, 1890, before which time he did not know they had been declared, and payment had been refused by defendant's treasurer, Mr. Moir.    On cross-examination the following questions were put and overruled :

" Q. And the 300 shares was all you ever did own of that stock ? "    Plaintiff objects as not cross-examination.    The court : " It is not material what stock he may have owned. He may demand for the dividends on these 300 shares.    The objection is sustained." [1]

" Q. You were the original subscriber to this stock in the beginning, were you not ? "

Plaintiff objects.

" Q. I mean an original subscriber to the stock on which you claim these dividends."

The Court : " That relates to this particular certificate, but it is not material when he became the owner of it, it is not cross-examination." [2]

On cross-examination plaintiff testified that when he demanded the dividends Moir told him they had been drawn by George Bullock ; and on re-examination, that he had replied to Moir that Mr. Bullock had no right to draw the dividends at all as the stock had been in the plaintiff's name for years.    On further cross-examination he was then asked :

" Q. This stock you sold and transferred to Mr. Bullock, did you not ? "

Objected to as not cross-examination.

The Court : " It seems to me, they having asked him noth-

ing but what took place at that meeting and the conversation, all you are entitled to is the full conversation, and nothing more on cross-examination." [3]

At the close of plaintiff's evidence, the plaintiff was called as if upon cross-examination.

The testimony developed the following facts:

Plaintiff had originally owned the 300 shares in question and had sold them to George Bullock, by whom they were transferred back to plaintiff as collateral for the following note:

" $40,000.         CONSHOHOCKEN, Penna., July 1st, 1882.

" Five years———after date I promise to pay to the order of A. Boyd, with interest payable quarterly, viz., October, January, April, and July, Forty thousand——× 100 Dollars, without defalcation for value received.   Along with the foregoing obligation I have delivered three hundred shares in Conshohocken Worsted Mills, as collateral security for the payment of the same on the day it becomes due.   If it be not paid at maturity, I hereby authorize and empower the holder of this promissory note to sell at public or private sale and transfer said collateral without reference or notice to me and to apply the proceeds thereof to the payment of said note, together with interest and charges thereon ; thereafter should any deficiency remain unpaid I further promise and agree to pay the same to the holder thereof on demand.

" Due———         GEORGE BULLOCK. "

When this note matured Bullock paid $18,000 and the interest and gave the following new note:

" $22,000.         PHILADELPHIA, June 29th, 1887.

" One year after date I promise to pay to the order of A. Boyd at First National bank of Conshohocken, twenty-two thousand × 100 dollars, for value received, without defalcation, hereby waiving all right to stay of execution and exemption of property in any suit on this note.   As collateral security I have delivered three hundred shares of Conshohocken Worsted Mills as collateral security, which I hereby authorize and empower the holder hereof, on default in payment at maturity, with a view to its liquidation, and all interests and costs thereon, to sell and transfer in whole or in part, without any previous demand upon or notice to me, either at Broker's Board or at public or private sale, with the right of becoming the purchaser

and absolute owner thereof, free of all trusts and claims, should such sale be made at Brokers' Board or be public.  Furthermore I agree that so often as the market price of these and subsequently deposited securities shall, before maturity of this note fall to a price insufficient to cover its amount with — per cent. margin added thereto—will on demand within two hours thereafter deposit with the holder, additional security to be approved by said holder, sufficient to cover said amount and margin; and that in default thereof this note shall become instantly due and payable precisely as though it had actually matured, and all the foregoing rights to sell and transfer collaterals shall at once be exercisable, at     risk, in case of any deficiency in realizing proceeds.

GEORGE BULLOCK."

Plaintiff testified that the second note was " a part renewal " of the first.  The second note at maturity was renewed by a third note dated June 28, 1888, for $22,000 at one year, Bullock paying the interest in advance.  The first and second notes had been surrendered to Bullock, and on the first note the plaintiff had indorsed the following :

" The three hundred shares of Conshohocken Worsted Mills within named placed with note dated June 29th, 1887, one year after date for twenty-two thousand dollars ($22,000)."

Bullock died insolvent before the dividends were demanded by plaintiff.  In rebuttal plaintiff testified, under objection, as a reason for his not going for his dividends, that Bullock, who was president and treasurer of the company, had told him " there was no dividends made."  [4]

The court charged in part as follows :

" It seems that Augustus Boyd was the owner of three hundred shares of stock of the defendant company.  A certificate was given to him by the company, and sometime afterwards this stock was sold to George Bullock, and Mr. Boyd transferred the stock upon the books of the company to Mr. Bullock. Mr. Bullock, it seems upon the evidence, did not pay for the stock, and it seems that he was also indebted to Mr. Boyd upon some other transaction; at least, a note for $40,000 was given by Mr. Bullock to Mr. Boyd, the plaintiff, and to secure the payment of that note the three hundred shares of stock were re-assigned by Mr. Bullock to Mr. Boyd.  They were to be as

collateral security to secure the payment of these $40,000. Therefore, the stock stood upon the books of the company as the stock of Aùgustus Boyd. He was entitled to the dividends of that stock. The registry of the stock is the evidence which the company has in the division of the dividends that are declared and the parties to whom they are payable.

" Therefore, if the company paid these dividends to any other person than the man whose name stands upon the books of the company as entitled to them, it is due that they should give some satisfactory explanation why they paid them to such other person rather than to the man who apparently is entitled to those dividends.

" It is not claimed that the plaintiff gave any direct authority to anyone to pay these dividends to any other than himself. In fact, he gave no directions directly, so far as there is anything in this evidence. It seems, however, that the company saw fit to pay them to George Bullock. Had it a right to make the payments to Mr. Bullock, and does such payment protect it in this suit for the dividends ? As I said, the company had no right to pay to anyone but Mr. Boyd, unless they can give some reason satisfactory to relieve them from the payment to Mr. Boyd. There is no evidence here that Mr. Boyd gave any directions that those dividends should be paid to Mr. Bullock. It is true that he did not claim them for some time, but while that might be some evidence to indicate to your minds that he did not consider himself entitled to them, yet when he explains that he had no knowledge that such dividends were declared, and that he made application to the president and treasurer of the company, and was informed that no dividends had been declared, it would seem, if you believe his testimony, a full explanation of his failure to make demand upon the company if he believed himself entitled to them. But the company does not claim that there was any direct authority from Mr. Boyd to pay these dividends to Mr. Bullock, but it contends that the transactions between Mr. Bullock and Mr. Boyd were of such a character that by virtue of those transactions Mr. Boyd released or waived the claim he may have had upon those dividends, and that they became payable to Mr. Bullock.

["Now this stock was assigned as security to pay $40,000.

Mr. Boyd, therefore, had a right to hold that stock as a protection until that note was paid. He was not only entitled to hold the stock, but he was entitled to the dividends that the stock might earn as an additional security for his debt. Has he done anything by which he has lost his right to those dividends ? It is said that he gave up the original $40,000 note and entered into a new transaction by taking a new note for $22,000 and obtaining a new pledge of this same stock, and that therefore he released by this new transaction any claim he may have had upon the dividends that were declared during the time that the $40,000 note was maturing. If this be true, then he has forfeited his claim to those dividends, and that is the main question of fact that you are to consider. Were these subsequent notes renewals of the original note of $40,000 ? If they were then those dividends belong to Mr. Boyd, the plaintiff, and he is entitled at your hands to a verdict for them, if you find that the last note was a renewal of the second and the second was a renewal of the first.] [5]

[" You have heard the evidence upon this point. There is nothing upon the face of the notes that directly indicates that the one was a renewal of the other, or that it was not. What was the intention of the parties at the time the second note was taken and at the time the third note was taken ? Because, if Mr. Boyd took this note as a renewal, and that was the intention of the parties when the second note was made, and again the intention of the parties when the third note was made, then he has not lost his right to those dividends.] [6]

[" You have heard the testimony of the plaintiff as well as the other testimony in this case, and you may consider that in determining what was the intention of the parties when the second note was taken and when the third note was taken. If it was to take it as a renewal of the previous note, then, as I have already stated to you, these dividends must be found for the plaintiff in this case. He testifies that he took the third note as a renewal. Then you may take the other facts in the case. These subsequent notes were made at or about the time that the original note matured, and he testifies that he received on account of the first note $18,000, and took the renewal note for the balance of $22,000. Then the stock continued upon the books of the company during all this time in the name of the

plaintiff. These, with other facts, are for you to consider in determining whether it was the intention of the parties to consider these subsequent notes as renewals of the prior notes.] [7]

["If I have a note from your foreman for $500 for one year, and at the end of the year take a new note for a similar amount, it does not necessarily follow that because I turned back to him the original note that I took the second note as a payment of the debt. It depends upon our understanding. It would not be a payment of the original note unless it was so understood between us."] [8]

The plaintiff's first and fifth points, affirmed, were as follow:

["1. That if the jury are satisfied from the evidence that the $22,000 note of Bullock now held by the plaintiff is a renewal of part of the original note of $40,000 (for which the stock in the defendant corporation was transferred to the plaintiff as collateral security) then the plaintiff is entitled to all the dividends on said stock declared before suit brought, while the same stood in his name, and the receipt of any of them by George Bullock, unless he be shown to have been thereunto authorized by the plaintiff, would not bar the plaintiff's right to recover such dividends."] [9]

["5. That if the jury shall be satisfied from the evidence that the $22,000 note now held by the plaintiff is a renewal of that much of the original $40,000 note which remained unpaid, and that the stock held as collateral remained during all the time in the name of the plaintiff, the right of the plaintiff to the dividends in suit was not affected by such renewal."] [10]

Defendant's 1st, 3d, 4th, 5th and 6th points, all simply refused except the first, the answer to which is given, were as follows:

["1. When Boyd, the plaintiff, accepted the three hundred shares of the Conshohocken Worsted Mill stock as collateral security for the payment of the $22,000 note of June 29, 1887, in evidence, he took it as it stood at that date, without the previously declared dividends (now sued for), which had been paid to Bullock by the defendant company anterior to said June 29, 1887. And therefore the verdict must be for the defendant." *Answer:* "This is true, unless the $22,000 note is a renewal for a part of the original debt and note."] [11]

["3. The court is requested to charge as a question of law

that the $40,000 note and the $22,000 note upon their face show the agreement of the parties thereto, and which must rule this case, to wit: That the $40,000 note was surrendered and satisfied together with the collateral or pledge, and that a new and entirely different contract was made in the $22,000 note, and therefore the plaintiff cannot recover."] [12]

[" 4. The fact that the contract of pledge in the $40,000 was not retained in the $22,000 note, as well as the material difference in the form and substance of the two notes, is conclusive evidence that when the $40,000 note was surrendered to Bullock it was settled and paid and the three hundred shares of stock mentioned in it as collateral security was released and surrendered to Bullock, and therefore the verdict must be for the defendant."] [13]

[" 5. That upon the law and evidence in this case the verdict must be in favor of the defendant, and the court is requested to so direct the jury to find."] [14]

[" 6. As there was a payment of $18,000 by George Bullock on the $40,000 note, dated July 1, 1882, when it came due, and there being no evidence that the dividends declared, being $5,700, were not part of this payment, the presumption is the plaintiff has received the dividends from Bullock and cannot recover in this case."] [15]

*Errors assigned* were (1–4) above rulings on evidence; (5–8) the portions of the charge as above in brackets, quoting charge; (9–15) the answers to the points as above, quoting points and anwers.

*John G. Johnson*, with him *Jacob Gotwalts* and *James Boyd*, for appellants.—Plaintiff accounted for his delay in not demanding a dividend declared in 1884 until 1890, by stating that he did not know before 1890 that any dividends had been declared. It was therefore proper to cross-examine him as to his opportunities for information, and he should have been compelled to answer the question in the first assignment of error.

The plaintiff claimed the dividends as owner and testified that he told Moir that Bullock had no right to draw the dividends, as the stock had been in the name of plaintiff for years. It was therefore proper to cross-examine him as to his ownership.

Had defendant been allowed to pursue these lines of inquiry, it might not have been necessary for him to have called the plaintiff at all; the result of defendant so calling him being, perhaps, to make him a competent witness generally.

Bullock being dead and his estate being here the real defendant, Boyd was incompetent to testify as to conversations between himself and Bullock: Act May 23, 1887, § 5, (*e*).

By the second note the old contract of pledge was replaced by a new one; and the 300 shares were replaced as collateral by a new contract, which defined the thing replaced and the terms of such replacing. Notice the differences in the terms of the two notes. See Fairbank v. Merchant's Nat. Bk., 30 Ill. Ap. 28; Fall River Nat. Bk. v. Slade, 153 Mass. 415.

The evidence as to whether or not the second and third notes were renewals was inadequately presented. The attention of the jury should have been directed to the facts that the first note together with the contract of pledge had been surrendered; that the replacing of the collateral for the new note was indorsed on the surrendered first note; that the terms of the second note were different and it was for a smaller amount; and that Bullock was dead and could not be heard.

*Charles Hunsicker* and *Joseph B. Townsend*, for appellee.— The plaintiff was a competent witness.

His suit was not against Bullock, but a corporation of which Bullock had been president and treasurer.

When defendant called plaintiff he made plaintiff a competent witness for all purposes: Act May 23, 1887, § 7; Yeakel's Appeal, 137 Pa. 160.

As long as any part of the original debt remains and new notes are taken in renewal, the collateral remains as security: Shrewsbury Savings Institution's Ap., 94 Pa. 309. See also Hart v. Boller, 15 S. & R. 162; Weakly v. Bell & Sterling, 9 W. 273; Day v. Leal, 14 Johns. 404; Hacker v. Perkins, 5 Wharton, 95; Oliphant v. Church & Carothers, 19 Pa. 318; Reed v. Defebaugh, 24 Pa. 495.

OPINION BY Mr. JUSTICE McCOLLUM, May 23, 1892:

It is not necessary to consider now whether Augustus Boyd was incompetent under clause (*e*) of § 5 of the act of May 23, 1887, to testify to matters occurring in the lifetime of George

Bullock, for if he was, his incompetency was removed by the action of the appellant company in calling him, under § 7 of that act, to testify to such matters.  When he was first called as a witness in his own behalf, his examination was confined to his demand on May 31, 1890, for the dividends, and this was more than a year after the death of Bullock.  He was then called by the appellant, and compelled to testify, as if under cross-examination, to matters occurring in Bullock's lifetime, after which he was a competent witness for himself " as to all relevant matters, whether or not these matters were touched upon in his cross-examination :" § 7, act of May 23, 1887, P. L. 160 ; Corson's Est., 137 Pa. 160.  The 4th specification of error is therefore overruled.

We think the learned judge of the court below was clearly right in holding that the questions contained in the 1st, 2d and 3d specifications of error were not admissible.  They were not relevant to the subject-matter of the examination in chief, and were evidently intended to introduce the appellant's defence under cover of a cross-examination.  The only matter to which the witness had testified was his demand for the dividends on May 31, 1890, and this did not open the door to a cross-examination of him concerning transactions he had with Bullock many years before.  If these transactions justified the company in refusing to pay the dividends on his demand, it was proper to show them as a part of its defence, but it could not introduce them in the manner proposed.  In considering the remaining specifications, regard must be had to the material facts which are admitted by the parties or established by the verdict.

It appears that on July 1, 1882, Boyd was the owner of 300 shares of the stock of the appellant company, and Bullock was indebted to him in the sum of $10,000.  On that day Boyd sold and transferred his stock to Bullock for $30,000, and received Bullock's note for $40,000 at five years, with interest payable quarterly.  This note was for the price of the stock and the amount of Bullock's indebtedness to Boyd on other matters.  As collateral to the note the stock was transferred by Bullock to Boyd, and a certificate therefor was issued to him and duly registered, so that from that time to the present Boyd has appeared on the books of the company as the owner

of the stock.  From the dividends declared by the company, after this transaction and before the maturity of the note, the sum of $5,700 belonged to the stock so held by him, but was paid by the company to Bullock, without any authority from the legal holder of the stock to make such payment, or notice to him that a dividend had been declared.  The uncontradicted testimony of Boyd is that he repeatedly spoke to Bullock on the subject of the dividends, and was always assured by him that the company had not declared any but that it was accumulating a fund as a working capital.  It appears now that a dividend of five per cent was declared by the company on November 11, 1884, one of six per cent on November 10, 1885, and one of eight per cent on November 9, 1886, and that these were all paid to Bullock, at the time or soon after they were declared. It is conceded that the dividends belonged to Boyd, and that in an action by him against the company to recover them at any time prior to June 29, 1887, the unauthorized payments to Bullock would not have been available as a defence.  But it is claimed that by a transaction with Bullock on that day he relinquished his right to the dividends.

What was that transaction?  A reduction of the debt to $22,000. by payment on account of it, a retention of the collateral security for it, a surrender of the old note, and an acceptance of a renewal note on one year's time for the balance of it.  It is true that the new note conferred on the creditor additional power over the collateral, but this was in aid of the creditor in the conversion of the security, and did not in any sense impair it.  It is clear from the testimony of Boyd that he did not understand that the transaction involved a surrender by him of $5,700 of the collateral security which he then held, and the only conclusion consistent with a belief in his veracity and Bullock's integrity is, that it was the mutual intention of the parties that Boyd should retain all the security he then had by virtue of the pledge of the stock in July, 1882.

It is contended that the claim of the appellant company respecting the nature and effect of this transaction is sustained by Fairbank v. Merchants' National Bank, 30 Ill. Ap. 28, decided by the Supreme Court of Illinois in October, 1889.  In that case a husband deposited with the bank, on May 14, 1883, as collateral security for his own note and the note of a firm

of which he was a member, 100 shares of his wife's stock in the Chicago City Railway Co. This stock had been previously pledged by him to the bank as security for his indebtedness to it, and, during the life of the first pledge, his wife received the dividends upon it. After her death the bank filed a bill in equity against her executor to compel her estate to account for and pay the dividends so received by her. The question was, whether the transaction of May 14, 1883, was a continuance of the pledge which was in force when she received the dividends or the creation of a new and distinct pledge. It was claimed by the bank that the note of May 14, 1883, was a renewal of the notes for which the stock was originally pledged, and by the estate that it was in satisfaction of them.

The court, conceding that the intention of the parties must govern, found the fact to be as claimed by the estate. But the evidence in that case differed materially from the evidence in this. In that case it was the duty of the court to find the facts and ascertain the intention of the parties, whilst in this these matters were for the jury, and our examination of the evidence is for the purpose of determining whether it is sufficient to support the verdict. It is probable that in each case the facts were correctly found from the evidence in it. We are satisfied, from our examination of the testimony in the case at bar, that the verdict was fully authorized by it.

The appellant company, with full knowledge that the dividends belonged to Boyd, who appeared on its books as the owner of the stock, and who, it is now admitted, was entitled to receive them, deliberately paid them to Bullock without the consent of or notice to the owner, and, whilst conceding the mispayment, seeks to evade its own just liability by setting up an alleged equity in Bullock's estate, arising from subsequent transactions between the pledgor and pledgee. It is a defence founded upon an unauthorized act, to which the company and Bullock were parties, and which was unknown to Boyd at the time of the transaction, in which it is claimed he surrendered, without knowing it, $5,700 of his collateral security. If it is technically admissible in this action, it is clear from the undisputed evidence that there is no substantial merit in it. A separate consideration of the second renewal is unnecessary,

because the condition existing after the first one was not changed by it.

The instructions to the jury were unobjectionable, and the remaining specifications of error are overruled.

Judgment affirmed.