# Smith *v.* Smith, Appellant.

*Trusts and trustees—Equity—Jurisdiction—Shares of stock—Statute of limitations.*

Where a daughter holds in her own name shares of stock belonging to her mother under an arrangement by which she is to sell or buy stock as her mother may direct, the daughter may, after the death of the mother, be compelled in a suit in equity to transfer the shares to her mother's administrator. The bill filed for such a purpose is not to compel specific performance, but to enforce a trust. In such a case the daughter cannot set up the statute of limitations as a defense, inasmuch as the services which required the stock to be kept in the daughter's name were not completed until the mother died, and the daughter made no adverse claim until that time.

Argued Oct. 12, 1908. Appeal, No. 29, Oct. T., 1908, by defendant, from decree of C. P. No. 2, Phila. Co., Dec. T., 1906, No. 769, on bill in equity in case of Samuel P. Smith, Administrator of Estate of Eliza Smith, deceased, v. Emma Smith. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Affirmed.

Bill in equity to enforce a trust.

BARRATT, J., filed the following opinion:

The defendant was very much concerned in her mother's lifetime lest her brother, Samuel P. Smith, might assert that all of the shares of stock, as well those rightfully her own as those owned by her mother, were the property of her mother; that she expressed a desire that her ownership of such shares as were her own should be acknowledged in writing by her mother,

Opinion of Court below.      [38 Pa. Superior Ct.

in order to avoid dispute; that she expressed this desire at a meeting on June 6, 1896. This meeting was participated in by the said Emma Smith, the said Eliza Smith, by an aunt, Mrs. Mary Little, and by Joseph K. Gamble and his wife, Mrs. Mary Gamble.

At the said meeting, and pursuant to the defendant's request, in which Mrs. Eliza Smith joined, a schedule was accordingly made, in writing, containing a list of the shares of Pennsylvania Railroad stock owned at that date by the mother and daughter respectively. The memorandum stated that 122 shares were owned by the mother, and thirty-nine by the daughter, making 161 shares in all. This memorandum was entered in a little memorandum book, and was read to the daughter. She assented to its correctness, saying that it was right, that she was glad it was drawn. It was thereupon signed by the mother, and by Mrs. Little as a witness. The reason that it was signed by the mother was that the parties supposed that she was the proper one to sign, as the memorandum was intended to be used by the daughter to prove the ownership of the thirty-nine shares in case the brother asserted that they belonged to the mother.

Nearly two years later, on or about February 10, 1898, the 161 shares were sold at a profit. The 161 shares so sold were handed to the witness, Joseph K. Gamble, for that purpose. The mother took hers from about her person. The daughter brought those that she owned from another room. The witness says of those handed over by the mother to be sold: "There were a great many very old ones; they had them back from the first period. They were an accumulation of twenty-odd years."

With the proceeds of the sale in February, 1898, plus a small additional sum, there were purchased on or about March 3 of that year, 170 shares, so that nine additional shares were thus acquired. Of this increase, the mother took two shares and the daughter took seven shares, and the mother then owned 124 shares and the daughter forty-six.

The nine shares additional were acquired in part through an excess in price at the time of the sale in February as com-

pared with the price at the time of purchase in March, and in part through moneys advanced by the mother on behalf of herself and of her daughter.

The 170 shares thus purchased were evidenced by two certificates, both in the name of the daughter, Emma Smith. One certificate was for 100 shares, and was No. 520,882. The other certificate was for seventy shares, and was No. 520,884. The ownerships, however, were not in the proportions indicated by this division, but as stated above, namely: 124 shares were the property of Mrs. Eliza Smith, and forty-six shares belonged to Emma Smith.

The sale and purchase were attended to by Mr. Gamble. He testifies that two certificates rather than one were obtained, because it seemed safer to him to have it divided in that way, as he thought it more dangerous for two women living alone to have all the stock in one certificate. He testifies that he had one made out for 100 shares, because shares are often sold by the hundred, and that the balance of seventy shares made up the other certificate. He testifies that the reason for putting the stock in Emma's name was this: "Mrs. Eliza Smith had agreed through Miss Emma Smith to have the stock made in her name, that if it was sold again quickly for a profit, they would have no calling in of witnesses to witness her mark. That was the reason for putting it in her name."

The mother at that time was seventy-six years old.

On June 11, 1898, the same parties who held the meeting in 1896 met together again at the house where the mother and daughter resided. At this meeting, at the joint request of Mrs. Smith and Miss Emma Smith, the memorandum of June 11, 1898, was dictated by Joseph K. Gamble, and was entered by his wife in the memorandum book. It was thereupon signed like the previous one, by the said Mrs. Eliza Smith, and for the same reason. It read as follows:

"Philadelphia, June 11, 1898. I, Eliza Smith, do certify and declare under my hand and seal of this date in presence of witnesses that I am the owner of one hundred and twenty-four shares of Pennsylvania Railroad stock that is in the name of my daughter, Emma Smith, and the balance and the re-

mainder is her own personal property, bought and paid for by her in cash. I certify to this fact that it will avoid any mistake or dispute in the future, and it is subject at any time to be of less amount if necessity requires me to sell, and she is the absolute owner of forty-six shares at this date."

.                                        her
.  " Eliza  ✕  Smith.
.                                       mark

"Witnesses:
"Joseph K. Gamble.
"Mary Little."

Some time after 1898 the daughter gave the two certificates to Mr. Benjamin T. Lyle, who was a relative by marriage, for safe-keeping. On March 25, 1902, the certificate No. 520,882, for 100 shares, was canceled at the request of the daughter, and a new one was issued for the same number of shares, but in the name of the mother, Eliza Smith. This certificate was delivered by Mr. Lyle to the plaintiff, administrator of Eliza Smith, after the latter's death. Mr. Lyle testifies respecting the cancellation of the older certificate and the substitution of the new one in the mother's name, as follows: "She (Emma Smith) came into my office and asked me to have that done, and I asked her what for, and she says, 'Mom desires it; if anything would happen to Mom there would be no trouble if this was done because they are hers, whether I paid part for them or not, I don't care.'"

Mr. Gamble testifies that in December, 1905, a few weeks before the mother's death, he was consulted by the mother and daughter relative to the question whether it would be wiser for them to sell the stock in order to purchase other securities. He advised them, he says, not to sell. He testifies that during this conversation, Emma Smith stated that she was the owner of forty-six shares.

Eliza Smith, in the presence of Emma Smith, stated during this same conversation that she, Eliza Smith, had 124 shares of stock. Mrs. Gamble says: "When her mother spoke of having her 124 shares changed she said, ' I have forty-six shares and I would like to change it if mother changes hers into bonds.'"

After the mother's death there was a meeting on February 6, 1906, at Mr. Lyle's house in Germantown. It was attended by Mr. Lyle, by the plaintiff and the defendant, and by Mr. and Mrs. Gamble. The book already mentioned was read aloud by Mr. Gamble, in the presence of all, including the defendant. The defendant made no remark respecting the book nor in regard to the reading, but immediately afterwards left the room.          •

It must be found, from the foregoing, that in 1898, a continuing trust was created in Emma Smith to hold and keep for her mother, Mrs. Eliza Smith, 124 shares of stock of the Pennsylvania Railroad Company, in order to facilitate the speedy sale from time to time of the shares, according to stock market conditions, and this with privacy, without the observation of neighbors who might have to be called in as witnesses, were the stock in the mother's own name. The mother was old, and unable through age to write her name, and the quickness and privacy were best secured, it was thought, by the method adopted.

The defendant denies that her mother purchased 124 shares with her own money, in March, 1898. She swears that she never saw the memorandum book until it was produced in evidence in court in this proceeding. She denies that she holds twenty-four or any shares of stock belonging to her mother. She denies the account given by Mr. and Mrs. Gamble of conversation in December, 1905.

There is nothing in the evidence to show how the right in the mother to have the certificate in Emma Smith's name replaced by one in the mother's name, in March, 1902, originated, unless the testimony by the witnesses of the creation of the trust in 1898 is believed. The testimony as to the entries in the memorandum book does explain it, and nothing else does. But that testimony establishes not only that the 100 shares were held in trust, but that twenty-four of the remaining seventy were held by Emma Smith upon the same trust.

The testimony is given by two disinterested witnesses. It is clear and positive, and it is corroborated in part by the entries in the memorandum book, and by the conduct of the

respondent in placing a portion of the shares in her mother's name in 1902.

Mr. Peace, a counsel for the respondent, urges that the income of the decedent, Mrs. Eliza Smith, was altogether too small to allow of the accumulation of money sufficient for the ownership by her of 124 shares of Pennsylvania Railroad stock. This need not be dwelt upon, for the reason that her financial resources in former years were not shown. It may be observed, however, that when she produced certificates of stock to Mr. Gamble in 1896, many of them, he testified, were very old, from the beginning, and this is a strong indication that the mother's property came largely and perhaps entirely from early years. But the court cannot enter into probabilities.

It is argued on behalf of the respondent that she worked at least thirty-six years, and that she earned on an average $9.00 per week, and that her only expense was her own maintenance; and hence that she has been abundantly able to purchase in her own right seventy shares and more. In corroboration of this, purchases by her in recent years were shown. Mr. Lyle testifies that he has bought other stock for her as follows: May 24, 1901—16 shares; July 1, 1903—15 shares; August 16, 1906—9 shares.

Thus in less than five years and a half, he bought for the defendant forty shares, which must have cost her in the neighborhood of $2,400, an average annual cost of over $400.

The court need not consider, however, the prosperity of the defendant. Positive evidence, which there is no reason to question, shows that she accepted a continuing trust in 1898 to hold the stock in question for her mother, to sell or to hold as the mother should direct, and that she continued to hold twenty-four shares upon that trust until her mother's death in 1906.

The defendant argues that equity has no jurisdiction in this case, because the bill seeks specific performance for an undertaking to deliver shares of stock, and that if a wrong has been done by refusal so to do, there can be compensation in damages, for which action must be brought at law: Edelman v. Latshaw, 159 Pa. 644; Roland v. Bank, 135 Pa. 598; Foll's

Appeal, 91 Pa. 434; Dungan v. Dohnert, 11 W. N. C. 303; 3 Parsons on Contracts, 364.

The answer to that argument is that the present case is not one for the specific performance of a contract. It is a case of trust. Equity has jurisdiction in order to ascertain and vindicate the trust.

In 2 Story's Equity Jurisprudence (13th ed.), sec. 718, the author, after alluding to the general rule not to entertain jurisdiction in equity for a specific performance of agreements respecting chattels, says that cases may readily be enumerated which are and have been deemed fit for the exercise of equity jurisdiction; to which the editor, Mr. Bigelow, adds in a note: "So in general where there is a relation of trust in respect of the property: Pooley v. Budd, 14 Beav. 34; Cowles v. Whitman, 10 Conn. 121; Hill v. Rockingham Bank, 44 N. H. 567; Clark v. Flint, 39 Mass. 231; Peer v. Kean, 14 Mich. 354."

In Hill v. Rockingham Bank, 44 N. H. 567, it was held that a bill in equity will lie to compel the delivery of certificates of stock to one who has already the equitable title to such stock. The court said: "It is true that a court of equity does not ordinarily interpose to enforce a specific performance of a contract respecting personal property, unless an adequate remedy at law cannot be had; but it is otherwise where the equitable title is already in the plaintiff, but the legal title in another."

In Kimball v. Morton, 5 N. J. Eq. 26, stock in a bank had been transferred to the defendant, to be by him transferred in different portions, one portion of which was to be transferred to the complainants. Upon bill filed to enforce this trust, a transfer was decreed.

In Cowles v. Whitman, 10 Conn. 121, it was agreed between A and B that A should subscribe, in the name of B, for five shares of the capital stock of a new bank about to be distributed, and that all the shares allowed on such subscription beyond what B could pay for, should be paid for by and belong to A; accordingly, A subscribed for five shares, in B's name, which were allowed, the first installment being paid by A from his own funds; B then declared her inability to pay for any

of such shares, and A paid the subsequent installments. On a bill in equity brought by A against the administrator of B for a transfer of these shares, it was held that a trust was created, and that the bill was sustainable, DAGGETT, CH. J., said: "It is contended that a bill will not lie for the specific execution of a contract relating to personal chattels merely, because there is adequate remedy at law. . . . I discern here no sale of this stock, nor any contract or agreement to transfer it. None of the cases cited, therefore, apply. On the contrary, I perceive a trust created, within the principles always applicable to this subject. Money is here paid, by these plaintiffs, for stock; and this stock, by her direction, stands in her name. They are the owners in equity; she is the owner at law. They now seek an execution of this trust; and this, by all the rules relating to trusts, comes within the peculiar province of a court of equity."

See also Williamson v. Krohn, 66 Fed. Repr. 655; Goodwin Gas Store & Meter Co.'s App., 117 Pa. 514; Wood v. Rowcliffe, 3 Hare, 304.

In 3 Page on Contracts, 2471 (sec. 1630), it is said: "Circumstances apart from the nature of the stock contracted for may make specific performance proper. Thus, if the party who agrees to transfer the stock holds it in trust for the party to whom he agrees to transfer it, as where the transferee has furnished the money with which the transferer bought the stock, or where the transferee originally transferred the stock to the transferer gratuitously under his agreement to reconvey on demand, or where the stock was originally acquired by the transferer under a contract to transfer it to the transferee on the payment by him of the amount agreed upon, specific performance will be granted, even apart from considerations of the difficulty of estimating damages or of obtaining the stock. The transaction gives to the transferee an equitable interest which equity will protect."

The respondent argues also that the statute of limitations bars the plaintiff's claim.

The statute of limitations has no application. Even were there no trust, it has been established by the evidence that the defendant did not hold adversely to the decedent. She did

not set up any adverse title until after her mother's death, only two years ago. On the contrary, the services to be rendered by the defendant, and which required her possession of the property, were not completed until the mother died, as during her life the parties contemplated continuous holdings, sales, etc., as the mother should direct. Where property is deposited for safe custody, a right of action does not accrue until demand is made therefor: Tidd v. Overell, L. R. (1893), 3 Ch. D. 154. So suit cannot be maintained for deposits of money with a banker without a previous demand. Until then the bank is in no default. Hence the statute of limitations does not protect the bank until six years have run since the demand was made: Trickett on Limitations in Pennsylvania, sec. 224; Girard Bank v. Bank of Penn Township, 39 Pa. 92; Finkbone's Appeal, 86 Pa. 368. Thus even under the principles enforced at law, the statute of limitations could not apply in the present case.

The position, however, of the respondent was that of a trustee under a continuous trust, and for that reason also the statute of limitations could not apply. The respondent did not act, adversely or otherwise, to terminate the trust relation as to the twenty-four shares under consideration, until her mother died.

The general rule is that the statute of limitations does not run between the trustee and the cestui que trust so long as the trust subsists, for the possession of the trustee is the possession of the cestui que trust. Before the statute can begin to run in favor of the trustee, the trust must terminate, either through the limitations assigned upon its creation, or by the acts of the parties; or else by a repudiation of the trust by the trustee and his assertion of an adverse claim. This is put concisely by Pothier. He says: "Where a man deposits money in the hands of another, to be kept for his use, the possession of the custodee ought to be deemed the possession of the owner, until application and refusal, or other denial of the right; for, until then, there is nothing adverse, and I conceive that upon principle, no action should be allowed in these cases, without a previous demand; consequently, that no limitation

should be computed further back than such demand:" 2 Pothier on Contracts, by Evans, 126.

The cases cited by the counsel for the respondent are not opposed to this conclusion.

In Downey v. Garard, 24 Pa. 52, it was the duty of the attorney to deliver the stock to his client, and his holding was adverse from the beginning.

In Lyon v. Marclay, 1 Watts, 271, property was delivered for the use of an illegitimate child, and action could have been brought either at law or in equity. See page 275.

In Zacharias v. Zacharias, 23 Pa. 452, the court held that the defendant was liable to action from the moment he received the plaintiff's money; which was certainly not the case here, where the very purpose of the trust was that the defendant should hold the property until the mother directed otherwise.

So in Commonwealth Title Ins., etc., Co. v. Folz, 23 Pa. Superior Ct. 558, the property was delivered for a specific purpose which could not be fulfilled, and the defendant was liable to action at once.

Counsel will submit a form of decree in accordance with this opinion—that complainant, administrator aforesaid, is the equitable owner and entitled to the said twenty-four shares of stock of the Pennsylvania Railroad Company.

The decree in favor of complainant will include a requirement of the giving of additional security by the complainant as administrator before receiving the twenty-four shares of stock.

*Error assigned* was the decree filed in accordance with the opinion.

*William H. Peace*, for appellant.—A trust should never be presumed without clear proof: Cook v. Fountain, 3 Swanston's Ch. Rep. 585; Young v. Young, 80 N. Y. 422.

If this were a resulting trust the remedy is not exclusively cognizable in equity, but an action would lie for damages, the value of the stock; and if the stock had at any time and all the time a fixed value daily ascertainable, then there is an ade-

quate remedy at law: Roland v. Bank, 135 Pa. 598; Edelman v. Latshaw, 159 Pa. 644; Rigg v. Ry. Co., 191 Pa. 298; Smaltz's App., 99 Pa. 310.

A trust to bar the statute must be such as is peculiarly and exclusively cognizable in equity, namely, those technical and continuing trusts which are not cognizable at law, but fall within the proper, peculiar and exclusive jurisdiction of a court of equity: Kane v. Bloodgood, 7 Johns. Ch. 90; Finney v. Cochran, 1 W. & S. 112; Lyon v. Marclay, 1 Watts, 271.

Here the facts would certainly seem to indicate, if ever, a trust, to which the statute would not apply, but the court held otherwise: Zacharias v. Zacharias, 23 Pa. 452; Miller v. Fulton, 206 Pa. 595; Downey v. Garard, 24 Pa. 52.

*Clarence L. Mitchell,* for appellee.

OPINION BY BEAVER, J., February 26, 1909:

The plaintiff filed a bill in equity in the court below, claiming that the defendant held twenty-four shares of the capital stock of the Pennsylvania railroad in a certificate issued to her which belonged to the estate for which the plaintiff was administrator and which was purchased in the lifetime of the decedent by the defendant at the request of, and with money belonging to, the decedent; that the defendant had been requested "to transfer to him, as administrator of the estate of Eliza Smith, deceased, the remaining twenty-four shares of said stock belonging to the estate of said Eliza Smith," alleging that the plaintiff had no adequate remedy at law, and praying, "1. That your orator, administrator as aforesaid, be decreed to be the equitable owner and entitled to the said twenty-four shares of stock of the Pennsylvania Railroad Company. 2. That the said defendant be required to assign to your orator, administrator as aforesaid, the said twenty-four shares of stock of the Pennsylvania Railroad Company. 3. That during the pendency of this action the defendant, her executors, administrators, agents, servants and employees be enjoined and restrained from selling or disposing of, or parting or interfering with, the said twenty-four shares of stock of the Pennsylvania Railroad Company, until otherwise ordered and directed by this court."

The defendant filed a demurrer, which was overruled, and answer made, denying the general averments of the bill.

The demurrer rested upon two general grounds: That the bill did not show ground for equitable relief and that the plaintiff had a complete legal remedy, and, second, that the statute of limitations barred the right of the plaintiff to claim the stock alleged to belong to the estate of the decedent. We think the demurrer was properly overruled.

Testimony was taken before Judge BARRATT of Court No. 2 of Philadelphia county. Two disinterested witnesses testified to a paper signed by the decedent which was dictated by one of the witnesses and reduced to writing by the other, which paper was alleged to have been reduced to writing and signed by the decedent at the request of the defendant, for the purpose of indicating clearly how much of the stock of the Pennsylvania Railroad held in the name of the defendant belonged to her and how much to her mother, the decedent. The paper was dictated and written down in the presence of the defendant and afterwards read to her, and the testimony showed that it was read to, and the facts therein asserted reaffirmed by, her, after it was written. The facts connected with the signing of this paper by the decedent were very carefully brought out in the examination of the plaintiff's witnesses, the cross-examination of the defendant and a discriminating examination by the court. There was some contradiction of this testimony, but the court found that the declaration dated "Philadelphia, June 11th, 1898. I, Eliza Smith, do certify and declare under my hand and seal of this date in presence of witnesses that I am the owner of one hundred and twenty-four shares of Pennsylvania Railroad stock that is in the name of my daughter, Emma Smith, and the balance and the remainder is her own personal property bought and paid for by her in cash. I certify to this fact that it will avoid any mistake or dispute in the future, and it is subject at any time to be of less amount if necessity requires me to sell, and she is the absolute owner of forty-six shares at this date," was, at the request of Emma Smith, dictated by Joseph K. Gamble to his wife, in the presence and hearing of Emma Smith and Eliza Smith. The signature was witnessed

by two witnesses, the person who dictated the paper and the sister of the decedent, who was not examined because of her extreme illness at the time of the hearing.     Upon cross-examination, the witness was asked: "Q. Why didn't you get Emma Smith to sign this paper, when you got Eliza to sign it?" and answered, "A. It was for the protection of Miss Emma Smith against her brother, and for that reason I had no idea it was necessary to have her name attached to it, because it was only she was afraid that after her mother's death her brother would not think she had the number of shares she had, and I thought if it was drawn up showing how much she had and how much her mother had, it would stop any dispute in the family."

The testimony, as we read it, sustains the findings of fact of the court below, to which exceptions were taken in the court below, and the refusal of the court to sustain said exceptions constitutes many of the assignments of error here.   The twenty-four shares referred to in the complainant's bill having been purchased with the money of the decedent and being in the name of the defendant, as found by the court below, justi-fied and sustained the conclusions of law that: "Positive evi-dence, which there is no reason to question, shows that she (defendant) accepted a continuing trust in 1898 to hold the stock in question for her mother, to sell or to hold, as the mother should direct, and that she continued to hold twenty-four shares upon that trust until her mother's death in 1906.

"The defendant argues that equity has no jurisdiction in this case, because the bill seeks specific performance for an under-taking to deliver shares of stock and that, if a wrong has been done by refusal so to do, there can be compensation in dam-ages, for which action must be brought at law: Edelman v. Latshaw, 159 Pa. 644; Roland v. Bank, 135 Pa. 598; Foll's Ap-peal, 91 Pa. 434; Dungan v. Dohnert, 11 W. N. C. 330; 3 Parsons on Contracts, 364.   The answer to that argument is that the present case is not one for the specific performance of a con-tract.   It is a case of trust.   Equity has jurisdiction in order to ascertain and vindicate the trust."   The court also held that the statute of limitations did not apply, saying: "Even were there no trust, it has been established by the evidence that the

defendant did not hold adversely to the decedent. She did not set up any adverse title until after her mother's death, only two years ago. On the contrary, the services to be rendered by the defendant, and which required her possession of the property, were not completed until the mother died, as during her life the parties contemplated continuous holdings, sales, etc., as the mother should direct."

The findings of fact and the conclusions of law sustain the decree of the court, declaring that, "The estate of Eliza Smith, deceased, is the equitable owner of, and entitled to, twenty-four shares of the capital stock of the Pennsylvania Railroad Company, evidenced (together with forty-six other shares) by certificate No. 520,884 in the name of Miss Emma Smith, and now in the possession of the defendant, Emma Smith," and "That the said defendant transfer and deliver to the said complainant the said twenty-four shares of stock upon the said Samuel P. Smith entering additional security as administrator of the estate of Eliza Smith, deceased, in the office of the register of wills, in the sum of $3,000," " and the defendant pay the costs of these proceedings."

The opinion of the court below in the conclusions of law arrived at is fully vindicated by the authorities which are cited and fully discussed. There is no necessity for requoting them here.

The defendant has thirty-six assignments of error, but the questions raised by them are those herein referred to and are satisfactorily disposed of by the opinion of Judge BARRATT in the court below. For the reasons therein set forth, and herein very briefly referred to, none of the said assignments is sustained.

Decree affirmed and appeal dismissed at the costs of the appellant.