## Felt v. Carr et al.

*Warren S. Spalding* and *J. Leon Rabben*, for plaintiff.

*James Francis Ryan*, assistant city solicitor, for defendants.

CRUMLISH, J., April 1, 1947.—Plaintiff has brought this action against Daniel J. Carr in order to establish a right to share in a certain fund of money awarded to Carr as finder thereof by this court on February 18, 1947: Carr v. Summers, 59 D. & C. 6. Plaintiff alleges that on January 7, 1945, he was an employe of the Office of Price Administration, and that defendant Carr was an employe of the Police Department of the City of Philadelphia; that in the course of their duties in searching for evidence in connection with certain violations of the law and certain charges against James Bailey, Samuel Bailey and Thomas Wagner, plaintiff and defendant Carr "jointly embarked upon a search" of the basement of the Board of Education Building at 21st Street and the Parkway, Philadelphia; that in the course of the search plaintiff and defendant Carr "together found and observed" a number of bank notes totaling $5,828, which

money was ultimately deposited with John W. Summers, chief clerk of the bureau of police, to be used as evidence in the prosecution of the persons previously named; that the said three accused persons denied ownership or knowledge of the ownership of the said fund, and the fund is not claimed by any one as its rightful owner; that neither the board of education nor the United States Government has claimed the fund; that the three accused persons were convicted of the crime of which they were accused, but the money referred to was not presented in evidence or in any way connected with the crime; that defendant Carr instituted an action in assumpsit on January 29, 1947, in Philadelphia County, Court of Common Pleas No. 7, December term, 1946, no. 2348, in which he claimed the "total sum of money as finder"; that no notice of the action or service of any papers therein has been given or made to complainant or any one else other than the custodian of the fund, John W. Summers, nor has any effort been made to locate the real owner or to notify claimants of the proceedings by advertisement in The Legal Intelligencer or a daily newspaper of the county; that the statement of claim in the assumpsit action referred to above read, in part, as follows:

"4. On January 7, 1945, Director Malone received an anonymous phone call that a further search of the storeroom wherein these ration books had been kept might produce additional information in the matter. As a result thereof, plaintiff and another detective joined with representatives of the Office of Price Administration who had previously taken charge of the storeroom in making a search thereof.

"5. In the course of the search plaintiff found on the floor under a packing case which he moved a number of bank notes and U. S. currency totaling $5,828. Plaintiff picked up this money and made known the finding thereof to the other searchers and reported the finding thereof to Director Malone";

that after an answer admitting the averments was filed by defendant in the aforementioned assumpsit action, judgment on the pleadings was entered for plaintiff (defendant in this action) on February 18, 1947. Plaintiff in this action further alleges that it was he who actually moved the packing case and, together with defendant Carr, observed the money in question; that he advised defendant Carr, at the time of the finding, of his claim to a share in the fund and has repeated this demand subsequently, conditioned upon locating the real owner; that the judgment in the assumpsit action referred to above is marked satisfied, but that defendant Carr has made no provision to divide the fund with him. Plaintiff requests that this court order defendant Carr to turn over to plaintiff one half of the total sum found, plus "such costs and damages" and such further relief as may seem just and proper.

Defendant Carr denied that he made the search jointly with plaintiff and alleges that he and another police officer had partly completed their search when defendant came in and helped pile some empty cartons out of the way. He also denies that plaintiff lifted or moved the packing case under which the money was found and alleges that he, defendant, lifted the case himself and that at the time the money was found plaintiff was at least 15 feet away. Defendant further alleges that the finding of the money was widely published as news at the time it was found and therefore no particular advertisements were inserted; that after the money was found and while it was being turned over to defendant's superior officer, plaintiff or some other OPA representative said something about the OPA laying claim to the money, that no other claim was ever made, that plaintiff has never claimed ownership and that he has never seen or spoken to plaintiff nor received any written or other demand from plaintiff.

James P. Dougherty was added as defendant at the final hearing when it appeared that he had possession of the money.

From the admissions in the pleadings, as offered in evidence, and from the testimony, the court makes the following

*Findings of fact*

1. On January 7, 1945, plaintiff and Herbert F. Walker, agents of the Office of Price Administration, were assigned to guard two basement rooms in the Board of Education Building at 21st Street and the Parkway, Philadelphia. The larger of the two rooms opened on a hallway and was used to store civilian defense equipment and other items; the smaller room opened into the larger room and was used to store OPA ration books.

2. On January 7, 1945, defendant Daniel C. Carr, and James A. McTague, police officers of the City of Philadelphia, were admitted into the above-mentioned rooms and entered them in the company of plaintiff's superior while plaintiff and Herbert F. Walker were guarding the rooms.

3. Defendant Carr and Officer McTague began a search of these rooms looking for evidence in connection with an arrest made two days earlier.

4. After defendant Carr and Officer McTague had been searching for a short while, plaintiff and Walker were instructed by their superior to assist in the search. Defendant Carr's instructions had come from his own superior, the director of public safety.

5. All four men searched the rooms, and other rooms as well, sometimes working together as they moved or lifted heavy crates, or tossed empty ones from one place to another, and sometimes working individually picking up and looking under boxes that were in the rooms.

6. During the course of this search defendant picked up a box and beneath it saw a bundle of United States currency, which he picked up. The search stopped; the money was counted and turned over to Carr's superior. It amounted to the sum of $5,828.

7. Wide publicity was given to the finding of this money in news articles at the time; it was offered in evidence in the criminal prosecution of the men whose arrest is referred to in finding number 3, but it was not admitted by the court as there was no proof that the money was connected with these men or their crimes; the United States Government has disclaimed any interest in the fund; the board of education has also stated that it has no claim to the money; no one else · has claimed the money as owner thereof.

8. The fund of $5,828 was awarded to defendant Carr as the finder thereof on February 18, 1947, as the result of proceedings instituted by him in the Court of Common Pleas No. 7 of Philadelphia County, December term, 1946, no. 2348.

9. The fund was received by defendant Carr's attorney and turned over by him to defendant James P. Dougherty, chief clerk of the department of public safety, to hold in safekeeping until further instructions from the attorney.

10. Prior to commencement of these proceedings, plaintiff submitted no claim, formal or otherwise, for the fund either to defendant Carr or to anyone else.

11. No notice was given to plaintiff of the commencement of the earlier proceedings brought by defendant Carr and referred to above, nor did plaintiff know of the proceedings until he read about the award in the daily papers.

## Discussion

Plaintiff bases his claim on the theory that he is a cofinder and, therefore, that Carr holds the fund subject to an equitable duty to convey one half of it to

him. If such is the case, a constructive trust would arise: A. L. I. Restatement of Restitution §160 and comment *a*. Equity has jurisdiction in all cases of trusts and so there can be no question that we have jurisdiction over the instant case: Peoples-Pittsburgh Trust Co. v. Saupp, 320 Pa. 138, 144 (1936).

The law of finders was discussed at length by this court in connection with these same facts in our opinion of February 18, 1947, in Carr v. Summers, 59 D. & C. 6. Also see Note, Rights of Finders in Pennsylvania, 49 Dickinson Law Rev. 124 (1945) (by Edgar R. Barnes, Jr.) ; see Hannah v. Peel (1945) K. B. 509, and 13 Univ. of Chicago Law Rev. 500 (1946). As the above references indicate; there are not many cases on the law of finders. It is to be expected, then, that there are even fewer on the subject of joint finders. We are unable to find any reported cases on the subject in Pennsylvania. However, there is no doubt that co-finders have equal rights in the thing found: Weeks v. Hackett, 104 Me. 264 (1908) ; Cummings v. Stone, 13 Mich. 70 (1864) ; Keron v. Cashman (N. J. Ch., 1896), 33 A. 1055; 34 Am. Jur. 639, §11; 36 C. J. S. 775, §6; 25 C. J. 1139, §11; 37 L. R. A. 120; 10 L. R. A. (NS) 1201; 1 Ann. Cas. 5; 15 Ann. Cas. 1156.

The only question to be determined in this case is whether the circumstances are such that the finding was the joint act of both Carr and Felt, rather than the act of Carr alone. The mere fact that they were both searching for the same object cannot be claimed to make them cofinders. If it did, Walker and McTague would also be cofinders and entitled to share in the fund. No one of the four make this contention. "All the cases agree that some intention or state of mind with reference to the lost property is an essential element to constitute a legal 'finder' (or finders) of such property . . .": Keron v. Cashman, supra, at p. 1057. The testimony relating to the facts of the

finding is conflicting and replete with vague and indefinite recollections of the witnesses. These conflicts must be resolved by the court after full consideration of the testimony, giving weight to the appearance and mannerisms of each witness, his possible interest in the case, the amount of substantiation given him by the other witnesses, and such other factors that will lend belief or disbelief to a person's statements. We have considered these things and have reached the conclusion that defendant Carr's version is the one to be believed.

Plaintiff testified that on January 7, 1945, he was an OPA investigator, and was assigned, together with another OPA investigator named Walker, to guard two rooms in the basement of the Board of Education Building, located on the Parkway in Philadelphia; that the purpose of the assignment was to watch over certain ration books that were kept in the smaller of the two rooms; that the smaller room could be reached only through the larger room which, in turn, opened onto a corridor; that he and Walker were in a small room on the other side of the corridor; that their superior officer gave them instructions to go into the rooms and make a search; that at this time, defendant Carr, and a police officer named McTague were searching in the rooms; that the four of them then began to search. He said: "Mr. Carr and I were working in a team. . . . We were working together. They had a balcony and the basement (sic) in one of the rooms, so we started from the balcony. We were moving cases, quite a number, and a lot of boxes, and some of them were quite heavy. He would move one and I would look underneath, and I would move one and he would look underneath. About quarter to 12 in the morning I moved a big case (which Felt later said weighed at least one hundred and fifty or two hundred pounds) and under the case there was the money, and

Mr. Carr picked it up. . . . He said, 'Gee, we found it.' " Plaintiff said that later, while waiting for Director Malone, "Mr. Carr and I discussed how we found the money, and I made the remark if the Government didn't claim it, or the City of Philadelphia didn't claim it, I said I believed it should be divided among the finders—(meaning) Mr. Carr and myself." When asked, "What did Mr. Carr reply to that?" plaintiff answered that Carr said, "Okay".

Plaintiff also testified that "about six months ago I met him (Carr) up in the Federal court room, Ninth and Market Streets, and I asked him what had become of the money. He said that the City of Philadelphia had it." On cross-examination, plaintiff said that "Mr. Walker and Mr. McTague were also moving the cases, to look for the money"; that all four of them were in the room when the money was found; that he did not at any time have his hands on the money; that he did not recall talking to McTague about the money and did not ask McTague about the possibility of Carr being sport enough to give him a trip to Florida.

Mr. Walker, plaintiff's fellow-guard, corroborated the general details of plaintiff's testimony. His testimony was more direct and straightforward, but not as pointed with respect to the finding. He said that Carr and McTague were in a small room first and that when they came out of there and into the larger room he and Felt were instructed by their superior to "start moving things"; that Mr. Carr and Mr. Felt searched together "quite a bit of the time, I couldn't say exactly. We were teamed up, McTague and myself, and Carr and Felt all the time. I mean, we were all pitching in to move all these cartons and beds. I think McTague and I were up in the balcony quite a long time. I know I had an awful lot of brute work, moving beds and things of that kind. Then, we were down on the ground floor of the room . . . moving these large boxes."

When asked by the court whether they were working independently or in teams, the witness answered: "Well, I was teamed up with the detective at that time, as I recall. We had OPA men and detectives working together. There was no reason for it that I could see . . . we had really to work it in twos, because the things were very heavy. . . ." When the money was found, the witness "was about in the middle of the room, behind Carr and Felt", and about three or four feet from them, but the witness did not "exactly remember where McTague was. . . . I heard somebody say, 'There it is' or something to that effect. Mr. Carr had the money, and if I recall correctly, Mr. Felt had just moved one of these big boxes that we had to move from one part to another, but when I saw it, Mr. Carr did have the money". He said that Felt was right beside Carr, about three feet from him, and admitted that he did not see Felt move the box. He also testified that he had searched other rooms in addition to the two already referred to and was in and out of the room where the money was found. On redirect examination, he testified as follows:

"Q. Did you, while you were watching Carr and Felt making a search, observe them searching together?

"A. Yes.

"Q. Did you at any time see Mr. Felt push back a packing case and Mr. Carr look underneath it?

"A. No; I don't recall that. I saw Mr.—both Mr. Carr and Mr. Felt move a lot of boxes at one time or another.

"Q. Did you at any time see one of them move a packing case and the other look underneath it?

"A. No."

Officer McTague, who made the search with defendant Carr, testified that he and Carr had searched the smaller room, and had already started on the

larger one when Walker and Felt joined them; he was tossing empty shoe cartons up to the stage, or balcony, and Felt and Walker were piling them up; "then, we went to another corner of the room, and Mr. Walker and I moved the Army cots forward, which were folded, and that gave us more room to move the larger cases. There were also some Red Cross first-aid packages . . . I moved them alone. At that time Mr. Walker and Mr. Felt were at the east end of the room. Carr was then moving the larger cases. They were cases about three feet high and about twenty-four inches square, and they had a ridge or rim around the top and bottom. . . . They weighed, I recall, one hundred and ten pounds; that was stamped right on them, . . . and they were hollowed out at the bottom. They were stacked up, and it was necessary for Carr and I to make aisles, and then we proceeded to move the other cases."

The witness said that meanwhile he went out and searched another room and afterwards, while in the corridor going to still another room, "I heard Carr call out, 'I have got it', and he started to holler out for McTague". He said that he "had a couple of conversations with Mr. Felt regarding this money . . . he spoke to me, it was during the second trial of the defendants in this ration book case. I don't recall the exact date. He asked me what had become of the money, and I told him I still had it in my possession, and it was being presented as evidence, and he said, 'Do you think there's any chance of our getting any of it?' and I told him there wasn't much likelihood, but there was an outside possibility that we might get some of it, depending on the attitude of the court, insofar as the money being evidence. He said, 'Well, do you think Carr would be sporting enough to give us at least the price of a trip to Florida?' So I told him he would have to see Carr about that."

Carr testified: "It's a pretty big room. There were these cartons the size of shoe boxes. It was very hot in there, and I took off my shirt, and I worked in my undershirt. We immediately started throwing these cartons up on the balcony, and also started moving the leg splints to the balcony. Then we (McTague and I) started working on these packing cases . . . I moved one carton. I moved it about five foot back of me, and stacked it up. The cartons weighed, I guess, from 100 to 115 pounds. They weren't heavy. One man could carry them, and I went to move another carton, and there was the money there." He said that Felt was not helping him with the carton and was about eight to 10 feet away; that Felt did not make any claim or suggestion as to the money at the time it was found; that he never heard Felt say it should be divided among the finders, and never agreed to it; that he has not "seen him (Felt) from that day until today"; that he "didn't know whose money it was. It was evidence. I couldn't divide the money up." Carr said he was not called as a witness in the case against the men accused of stealing the ration books.

Both Walker and McTague stated that they make no claim to the money.

Plaintiff's testimony did not impress the court. It was vague when it touched upon matters that might hurt his case, and too specific where it could help establish his claim. In particular, we do not believe that under the circumstances, the money being considered evidence in an important criminal case, plaintiff would have thought to speak to Carr, just after the money was found, about the possibility of it being divided among the "finders" if neither the Government nor the City of Philadelphia claimed it. The conversation related by McTague, which supposedly occurred during the second trial, seems more likely to be true. By that time the money had been refused as evidence in

one trial, its ownership denied by the accused persons, and no one had claimed it. On the whole, we believe that Carr lifted the crate by himself and found the money. Carr's testimony that Felt was 8 to 10 feet from him when he found the money can be reconciled with Walker's statement that when he looked up Felt was about three feet from Carr, as Felt had time to move closer to Carr, and would naturally do so, in the interval between the finding and Walker's looking. Furthermore, the distances were admittedly rough estimates. Also, all of the witnesses agreed that they had cleared a floor space at one end of the room. This would substantiate Carr's testimony that he was moving the boxes, not just tilting them, as there would be no need to clear the space if they were only to tilt them.

Accordingly, we enter the following

### Conclusions of law

1. The court has jurisdiction over the parties and the subject matter.

2. Plaintiff is not a cofinder with defendant, Daniel J. Carr, of the money in question.

3. Plaintiff is not entitled to the relief requested, or to any other relief whatsoever.

### Decree nisi

And now, April 1, 1947, it is ordered, adjudged and decreed as follows:

1. The bill in equity is hereby dismissed;

2. Plaintiff shall pay the costs of these proceedings.

The prothonotary is directed to enter this decree nisi and to give notice to the parties, or their counsel of record, of the entry of this decree, and, if no exceptions are filed within 10 days thereafter, the decree nisi shall be entered as the final decree, by the prothonotary, as of course.