Peoples-Pittsburgh Trust Company,
Appellant, *v.* Saupp.

Argued October 10, 1935.   Before Frazer, C. J., Kephart, Schaffer, Maxey, Drew, Linn and Barnes, JJ.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*Joseph A. Beck,* for appellee.

OPINION BY MR. JUSTICE MAXEY, January 6, 1936:

On October 7, 1929, appellee executed her promissory note and became indebted to the East End Savings & Trust Company, herinafter referred to as the East End Trust Company, in the sum of $11,300. In accordance with the terms of the note she pledged therewith as collateral security certain stock which was by express covenant to be held by the pledgee for the security of all of appellee's indebtedness, both present or future, absolute or contingent. Among this collateral security were forty-five shares of the capital stock of the Mesta Machine Company, hereinafter referred to as the Machine Company. She delivered to the East End Trust Company a certificate for these forty-five shares of stock and a power of attorney to transfer the stock. On March 28, 1932, appellee became indebted to appellant as an endorser on a promissory note of Frank D. Saupp, Inc., in the sum of $23,000. The appellant, Peoples-Pittsburgh Trust Company, is now the holder of both notes, which are past due. At the time the suit was filed there was due $3,735.97 on the note on which appellee is maker and $16,938.35, with interest from April 27, 1932, including protest charges of $2.75, on the note on which appellee is endorser.

On November 30, 1934, appellant held one hundred shares of the Machine Company's stock (standing in the name of Katherine L. Saupp and accompanied by a power of attorney to transfer the stock), as part of the collateral pledged by Mrs. Saupp as security for her indebtedness. On that day the Machine Company paid a stock dividend of 66⅔% upon its capital stock. Previously, in February, 1930, the Machine Company declared and paid a stock dividend upon its capital stock, said stock dividend consisting of an exchange of ten shares of the Machine Company stock for each share of the stock outstanding, and the East End Trust Company received four hundred and fifty shares of the stock, to be held by it as pledgee, in lieu of the forty-five shares theretofore held by it. At various dates subsequent to demands for payment of the note for $11,300, appellant sold portions of the Machine Company stock held by it as security. These sales totaled three hundred and fifty shares in all, and the proceeds thereof were applied to the unpaid balance on this note, leaving one hundred shares still in the hands of appellant. When the stock dividend of 66⅔% upon its capital stock was paid by the Machine Company on November 30, 1934, appellee, as the registered holder of one hundred shares of the Machine Company stock still in the hands of appellant as collateral, received from that company a certificate for 66⅔ shares of its stock. Appellant claims that it as pledgee of the one hundred shares of stock is entitled to the certificate for these 66⅔ shares, properly endorsed, so that the same may be held as collateral to the note for $11,300, above referred to, and also as collateral to the contingent liability of the appellee on the note for $23,000.

Appellant demanded that appellee deliver to it the certificate for 66⅔ shares of the Machine Company stock, representing the stock dividend of November 30, 1934, but appellee refused to deliver the same or any part thereof to appellant. Appellant prayed that appel-

lee "be enjoined and restrained from selling, pledging, or in any manner transferring the said 66⅔ shares of Mesta Machine Company stock, or any part thereof, until the payment and discharge of her indebtedness to the appellant, and that she be ordered and required to deliver to appellant the certificate or certificates for the said 66⅔ shares of the said Mesta Machine Company stock, or certificates for an equal number of shares, properly endorsed by the appellee in the form requisite for transfer thereof to the appellant." The court below refused the relief and dismissed the bill. The court said: "The only question before the court for determination is that raised by the preliminary objection to the effect that there is adequate remedy at law and hence no need for the exercise by this court of its equitable powers." The court said that "there is no particular difficulty in ascertaining the value of the stock as to any particular day or date," and that the chattels are not of a peculiar, historical and sentimental value, and therefore there is no justification for decreeing specific performance as to these shares of stock.

It becomes important to analyze the nature of the transaction giving rise to this case. When appellant held the certificate, with power of attorney, etc., for 100 shares of stock of the Machine Company, which stock was not transferred to it on the books of the company, it merely held a piece of paper as evidence of the fact that appellee, i. e., the pledgor, had a certain interest, as set forth in that paper, in the stock of the Machine Company, *which interest the appellee was holding in trust for appellant as security for her indebtedness.* She was at all times after pledging this stock a trustee for appellant of that interest in the Machine Company. Williston on Contracts, volume 2, section 1042, says: "In these cases [i. e., in cases of pledging stock certificates, bank books, etc.] the bailment of the paper is in legal effect the pledge of the intangible right which the paper represents. So the deposit for security of negotiable ware-

house receipts and bills of lading may be a pledge of the goods represented by these documents, since the possession of the documents controls the possession of the goods." Appellant was bailee of the *paper,* i. e., *the stock certificate,* which Mrs. Saupp had given it and could not use that certificate for any other purpose except in a certain specified contingency, with power of attorney to transfer to itself, i. e., appellant, Mrs. Saupp's interest in the Machine Company, then sell that interest and apply the proceeds to the payment of her debt to it. Had appellant used that certificate otherwise, it would have been a breach of trust on its part as toward her. But, on the other hand, Mrs. Saupp held her interest in the Machine Company, which interest was evidenced by this paper, in trust for appellant. As to that interest, Mrs. Saupp was pledgor and appellant was pledgee.

It is well recognized that "a pledgee is entitled to hold the natural increase of the thing pledged. Thus if he has taken in pledge domestic animals, he will hold in pledge the young of such animals afterward born": Jones on Collateral Securities (Pledges), section 396. It has likewise been held that dividends accruing upon pledged stock belong to the pledgee: Herman v. Maxwell, 15 J. & S. (N. Y.) 347; Boyd v. Conshohocken, etc., Mills, 149 Pa. 363, 24 A. 287. In McCrea v. Yule, 68 N. J. L. 465, 53 A. 210, it was held that a pledgee of personal property, assigned as collateral security, has the right to collect the interest, dividends, and income accruing on the collateral assigned, accounting to the pledgor upon the redemption of the pledge. In making such collections, the pledgee is a trustee of the pledgor for the proper application of the funds collected or to refund the same to the pledgor if the debt be otherwise paid. Applying these principles to the instant case, it follows that Mrs. Saupp had a certain interest in the Machine Company represented by one hundred shares of stock which she had pledged as security and that she

was trustee of that entire interest for the benefit of appellant until her debt to appellant was paid. Let us assume merely for illustration that that interest was 10% of the entire stock of the Machine Company. When the company issued a stock dividend of 66⅔% and delivered the appropriate shares to Mrs. Saupp and she retained physical possession of them, she was depriving appellant of a part of the indicia of her ownership of a 10% interest in that company, for the one hundred shares of stock held by appellant no longer represented a 10% interest in the capital stock of that company. It represented only a 6% interest and the 66⅔ new shares issued to Mrs. Saupp represented a 4% interest. Mrs. Saupp was under the same obligation to turn over these 66⅔ shares to appellant as she would have been to turn over a cash dividend which might have been paid her on the stock she had pledged as security.

Mrs. Saupp's retention of the 66⅔ shares of the Machine Company stock, received by her as a stock dividend, was a breach of an implied trust on her part. It became her duty in good morals and in conformity with the canons of square dealing, to turn the certificate evidencing her increased holdings in the Machine Company, which, however, did not increase *her proportionate interest in the capital stock of that company,* over to appellant. An implied trust arose out of that situation. "Implied trusts are . . . those . . . deducible from the nature of the transaction as matters of intent, or which are superinduced upon the transaction by operation of law as matters of equity, independently of the intention of the parties": 65 C. J., section 12, page 221. "Implied trusts arise by implication of law because morality, justice, conscience and fair dealing demand that the relation be established": Dixon v. Dixon, 124 A. 198. In Beatty v. Guggenheim Exploration Co., 225 N. Y. 380, 122 N. E. 378, the New York Court of Appeals, speaking through Mr. Justice CARDOZO said: "A constructive trust is the formula through which the con-

science of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." Courts act upon the same logic in *implying* a trust.

"The jurisdiction of equity in all cases of trusts, express or implied, resulting or constructive, is unquestioned": 21 C. J., section 93, page 116. Pomeroy in his work on Equity Jurisprudence, 2d ed., volume 1, section 151, says: "The doctrine of trusts became and continues to be the most efficient instrument in the hands of a chancellor for maintaining justice, good faith and good conscience." This was cited with approval in Clews v. Jamieson, 182 U. S. 461, 479.

The instant case is not one of a suit for the specific performance of a contract for which an action at law would lie; it is an appeal to a court of equity to recognize and enforce an implied trust.

In Smith v. Smith, 38 Pa. Superior Ct. 251, it was held that where a daughter holds in her own name shares of Pennsylvania Railroad Co. stock belonging to her mother, the daughter may, after her mother's death, be compelled by a suit in equity to transfer the shares to her mother's administrator. In that case the Superior Court, quoting from the opinion of the court below, said: "The defendant argues that equity has no jurisdiction in this case, because the bill seeks specific performance for an undertaking to deliver shares of stock and that, if a wrong has been done by refusal so to do, there can be compensation in damages, for which action must be brought at law: Edelman v. Latshaw, 159 Pa. 644 [28 A. 475]; Foll's App., 91 Pa. 434; Dungan v. Dohnert, 11 W. N. C. 330; 3 Parsons on Contracts, 364. The answer to that argument is that the present case is not one for the specific performance of a contract. It is a case of trust. Equity has jurisdiction in order to ascertain and vindicate the trust." In the opinion of the court below in that case appears the following quotation from

3 Page on Contracts, 2471 (section 1630): "Circumstances apart from the nature of the stock contracted for may make specific performance proper. Thus, if the party who agrees to transfer the stock holds it in trust for the party to whom he agrees to transfer it, as where the transferee has furnished the money with which the transferer bought the stock, or where the transferee originally transferred the stock to the transferer gratuitously under his agreement to reconvey on demand, or where the stock was originally acquired by the transferer under a contract to transfer it to the transferee on the payment by him of the amount agreed upon, specific performance will be granted, even apart from considerations of the difficulty of estimating damages or of obtaining the stock. The transaction gives to the transferee an equitable interest which equity will protect."

Having found that there was an implied trust that appellee deliver to appellant the 66⅔ shares of stock issued as a stock dividend on the one hundred shares held by appellant as security for appellee's indebtedness to it, for otherwise the pledge in appellant's hands would be reduced in value by 66⅔%, no further discussion of appellant's right to go into equity to seek the relief prayed for is necessary. However, since a large part of appellee's argument is based on the proposition that appellant had an adequate remedy at law and therefore is not entitled to specific performance, it may be added that a remedy at law would in this case be circuitous and probably inadequate, and as this court said in Edison Illuminating Co. v. Eastern Pa. Power Co., 253 Pa. 457, 98 A. 652: "The mere fact that a remedy at law exists is not sufficient to oust equitable jurisdiction; the question is whether the remedy is adequate and complete: Bierbower's App., 107 Pa. 14; P. R. R. Co. v. Bogert, 209 Pa. 589 [59 A. 100]." Judge Story in 2 Story's Equity Jurisprudence, section 728, said: "Courts of equity ought not to decline the jurisdiction for a specific performance of contracts whenever the

remedy at law is doubtful in its nature, extent, operation or adequacy." 25 R. C. L., section 27, page 229, lays down this principle: "A decree for specific performance is given instead of damages when by this means a court can do more perfect and complete justice." In Union Pacific Ry. Co. et al. v. Chicago, Rock Island & Pac. Ry. Co. et al., 163 U. S. 601, the United States Supreme Court said: "It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them." In Pomeroy's Equity Jurisprudence, 4th edition, volume 1, section 111, appears this statement: "Equity has followed the true principle of contriving its remedies so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated. It has, therefore, never placed any limits to the remedies which it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." In the Appeal of the Brush Electric Co. et al., 114 Pa. 574, 7 A. 794, in which the court below had summarily dismissed a bill on the ground that plaintiffs had an adequate remedy at law, this court said: "Equitable jurisdiction does not depend on the want of a common law remedy, for whilst there may be such a remedy it may be inadequate to meet all the requirements of a given case, or to effect complete justice between the contending parties, hence the exercise of chancery powers must often depend on the sound discretion of the court." In that case the action of the court below in dismissing the bill was reversed.

The decree of the court below is reversed and the bill reinstated, with a procedendo. Costs to abide the final decree.