Buchanan et al., Appellants, *v.* Brentwood Federal Savings & Loan Assoc.

Argued September 25, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

W. R. Lorry and Daniel M. Berger, with them Michael P. Malakoff, James H. Joseph, Herbert G. Sheinberg, Stewart B. Barmen, Berger & Kapetan, James H. Joseph, P. C., and Raphael, Sheinberg & Barmen, P. A., for appellants.

Alexander Black and David B. Fawcett, Jr., with them David S. Watson, Judah I. Labovitz, Alexander C. Sherrard, William M. Hoffman, Harold H. Goldman, James Russell Sweeny, E. D. Hollinshead, Jr., Daniel P. Stefko, G. Harold Blaxter, Charles F. Hodel, Jr., John M. Means, J. Tomlinson Fort, James J. Restivo, Jr., Frank R. Bolte, Donald S. Hershman, William H. Markus, W. Walter Braham, Jr., Judd N. Poffinberger, Jr., Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Dickie, McCamey & Chilcote, Thorp, Reed & Armstrong, Wolf, Block, Schorr & Solis-Cohen, Campbell, Thomas & Burke, Goldman & Unatin, Hollinshead & Mendelson, Blaxter, O'Neil, Houston & Nash, Smith, Hodel & Means, Reed, Smith, Shaw & McClay, Baskin, Boreman, Wilner, Sachs, Gondelman & Craig, and Kirkpatrick, Lockhart, Johnson & Hutchison, for appellees.

*Jerome H. Gerber* and *Handler, Gerber, Widmer and Weinstock,* for Pennsylvania State AFL-CIO, amicus curiae.

*Robert S. Ryan, William C. Bullitt,* and *Drinker, Biddle & Reath,* for Pennsylvania Association of Mutual Savings Banks, amicus curiae.

*William H. Markus* and *Markus, Riethmuller & Smith,* for Pennsylvania Savings and Loan League, amicus curiae.

OPINION BY MR. JUSTICE ROBERTS, April 23, 1974:

Appellants are twenty-nine individuals, representing a class of like-situated individuals, who have entered into mortgages with mortgage lending institutions in the Pittsburgh area. This present class action was commenced on December 7, 1971, with a complaint filed by eighteen named plaintiffs against seven banking institutions and the Federal National Mortgage Association (FNMA). All defendants except FNMA filed a preliminary objection in the nature of a demurrer. On April 4, 1972, an amended complaint adding eleven plaintiffs was filed against the original and twenty-four additional defendants and all other similarly-situated banking institutions and savings and loan associations in the Pittsburgh area. To this complaint all but six of the thirty-two defendants demurred. A second amended complaint alleging an additional cause of action was filed on May 11, 1972. Again, most of the named defendants filed a single preliminary objection demurring to appellants' complaints.

The Court of Common Pleas of Allegheny County sustained appellees' joint demurrer and dismissed appellants' complaints for failure to state a cause of action. Ten separate appeals were taken from that de-

cree.[1]  We reverse and remand to the trial court for proceedings consistent with this opinion.

A demurrer admits as true all well-pleaded facts and all inferences reasonably deducible from them, but not any conclusions of law. *Reardon v. Wilbur*, 441 Pa. 551, 554, 272 A.2d 888, 890 (1971); *Clevenstein v. Rizzuto*, 439 Pa. 397, 400-01, 266 A.2d 623, 624-25 (1970); *Hoffman v. Misericordia Hospital*, 439 Pa. 501, 503-04, 267 A.2d 867, 868 (1970). Only if "upon the facts averred, the law says with certainty that no recovery is permitted," *Clevenstein*, supra at 401, 266 A.2d at 625, will this Court sustain the demurrer. "Where a doubt exists as to whether a demurrer should be sustained, this should be resolved in favor of overruling it." Id.; see *King v. United States Steel Corp.*, 432 Pa. 140, 143-44, 247 A.2d 563, 565 (1968).

Appellants allege that they have borrowed money from appellees, mortgage lending institutions in the Pittsburgh area, and as security for these loans have given to appellees mortgages upon real property owned by them, and have executed personal bonds accompanying the mortgages.  Each mortgage and personal bond, it is alleged, contains a provision which requires the mortgagor to pay all taxes and assessments levied on the mortgagor's real estate, and all fire and casualty insurance premiums on the property.  Further, appellants assert they are required to pay each month to appellees one-twelfth of the annual taxes, assessments, and fire and casualty insurance premiums due on their property.[2]  Appellants aver that they have made these

---

[1] This Court has jurisdiction by reason of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II. § 202(4), 17 P.S. § 211.202(4) (Supp. 1973).

[2] Hereinafter, references to monthly tax payments, monthly payments, or tax payments are to be considered shorthand expressions of monthly payments for taxes, real estate and other assessments, and fire and casualty insurance premiums.

monthly payments according to the provisions in the mortgage and bond agreements. Appellants further allege that the monthly tax payments were paid to appellees to hold as "trustees or other fiduciary" for appellants. According to appellants' complaint, appellees have commingled these monthly tax payments with their own funds, invested them, and earned (and continue to earn) interest on their use. Appellants finally assert that appellees have failed, and continue to fail, (1) to segregate the monthly tax payments from the general funds in their possession, (2) to apply the monthly tax payments against appellants' mortgages, and (3) to account to appellants for the interest earned on the monthly payments.

Because this dispute is over how mortgage lending institutions deal with the monthly tax payments, a brief description of the industry practice would be helpful.[3]

---

[3] Department of Research & Economics, United States Savings & Loan League, Factors Governing the Economics of Escrow Accounts (Jan. 1973) (hereinafter cited as Escrow Study). The Escrow Study used the following methodology.

"The initial questionnaire was mailed to all members of the United States Savings and Loan League. Replies were received from 1,141 savings and loans or 20.8% of the 5,490 operating associations in the nation at mid-year 1972. These associations had $90.3 billion in assets, representing 40.2% of the total assets of the business. . . .

"The group was weighted in favor of associations with assets of $50 million or more. Few replies were received from the very small associations with assets of under $5 million. In the $5 million to $10 million asset range 269 associations reported, representing 18.4% of the total in that asset range. In the $25 million to $50 million group, 33.0% of the associations responded. In the $50 million to $100 million range, the percentage of replies rose to 48.5%. The peak of 64.1% occurred in the $150 million to $200 group.

. . . .

"There was a good geographic distribution of respondents, with a number of states being represented by 33% to 50% of the

In the 1930's substantial numbers of foreclosures were caused by inability to pay annual assessments.[4] As a result of this, banks began requiring the monthly tax payments. The theory was that individual homeowners, especially small borrowers, would find it easier to make monthly payments of one-twelfth the yearly taxes, than to meet in a single payment the annual bill. The practice has continued ever since.

There are basically two methods used to handle the monthly tax payments. Payments are either held in what are known as real estate and insurance escrow accounts or they are capitalized. The escrow system envisions that the bank establish individual records, credit an account upon receipt of the monthly payment, and debit it when the bank pays taxes to the appropriate authority. The outstanding balance is carried as a liability on the bank's balance sheet under the caption "Advance Payment by Borrowers for Taxes and Insurance." The funds deposited by mortgagors are freely commingled with the mortgagee's general funds and used to earn income.[5]

---

associations within their borders. . . . In 21 of the states, respondents held 50% or more of the assets of the business. In another 16, the holdings ranged between 40% and 50% of the assets. Four states were represented by 30% to 40%. Forty-one states, thus, had a level of returned questionnaires in excess of 30%.

"There is one caveat regarding coverage. Not all responding institutions were able to answer all questions. . . . The survey was developed with the view of finding as many facts and as much data as possible about escrow accounts."

Id. 2-3. See generally Comment, Payment of Interest on Mortgage Escrow Accounts: Judicial and Legislative Developments, 23 Syracuse L. Rev. 845 (1972).

4 "In 1933, 26.3% of property taxes in America's 200 largest cities were delinquent." Escrow Study 4. Delinquent taxes either caused foreclosures or reduced the marketability of houses.

5 Appellees here do not dispute that they in fact invest the monthly tax payments for their own account. They do strenuously

Other mortgage lending institutions capitalize the monthly tax payments. Under this system, all payments, when received, are applied to decrease the principal of the loan. When payments (whether for tax, other assessments, or insurance premiums) are paid by the bank, the outstanding balance is accordingly increased. "The borrower receives an advantage by this monthly reduction and, in a real sense, receives a return on his monthly payments."[6] The overwhelming majority of mortgage lending institutions employ the escrow account system.[7]

Appellants present three claims to this Court.[8] First, the agreement between the parties manifests a clear intent to create a trust, with the mortgage lending institutions holding appellants' monthly tax payments in trust solely for the specific purpose of paying appellants' taxes, assessments, fire and casualty insurance. The relief sought is to require the mortgage lending institutions to account to appellants for any profits derived from their investment of the monthly payments. Alternatively, a constructive trust should be imposed

argue that nothing, either in law or in contract, prevents them from doing so. See Escrow Study 7.

[6] Escrow Study 3.

[7] "Of the responding institutions, 83.6% used the escrow method, and they held 92.0% of the total assets. The capitalization method was employed by a much smaller 16.4% of the respondents holding 8.0% of the assets of the responding group. Thus, the escrow approach is by far the most commonly used method by savings and loan associations." Id.

[8] Count II of appellants' amended complaint alleged that the contractual provision requiring that they pay each month one-twelfth of the annual taxes was a contract of adhesion and contrary to public policy. The trial court disagreed with appellants' argument. On appeal, appellants have abandoned their general attack on the propriety of the requirement, and instead concentrated on the illegality of the manner in which the mortgage lending institutions have been handling the monthly payments.

on the earnings produced by the use of appellants' monies. Second, the mortgage lending institutions, it is contended, breached an implied contract to continue to capitalize the monthly tax payments. This breach proximately caused appellants damage by forcing them to pay, in effect, a higher interest rate on their loans. Appellants seek a refund of all "interest" improperly collected. Third, appellants claim that appellees have violated and are violating the Truth in Lending Act, 15 U.S.C.A. §§ 1601-65 (Supp. 1973), by failing to include the monthly tax payments in their computation of the required "finance charge." Id. § 1605. For these violations, appellants ask for the statutorily-provided penalty. Id. § 1640.

## I.

Appellants first contend that they alleged sufficient facts to properly put in issue the creation of a trust, and therefore, the trial court erred in sustaining appellees' demurrer and in dismissing appellants' complaint. We agree. We believe that the trial court failed to apply the correct standard in concluding that appellants' complaint did not state a cause of action. *Clevenstein,* supra at 400-01, 266 A.2d at 624-25.

It is well settled that no particular form of words or conduct is necessary to create a trust. *Provident Trust Co. v. Lukens Steel Co.,* 359 Pa. 1, 58 A.2d 23 (1948); *Bair v. Snyder County State Bank,* 314 Pa. 85, 171 A. 274 (1934); Restatement (Second) of Trusts § 24 (1959). Neither the presence nor the absence of the words "trust," "trustee," or "beneficiary" is determinative of an intention to create a trust. *Thompson Will,* 416 Pa. 249, 254-55, 206 A.2d 21, 25 (1965); 1 A. Scott, Law of Trusts § 24 (3d ed. 1967). The question is whether the agreements taken as a whole evidence an intent by appellants "to impose . . . upon a

transferee of the property equitable duties to deal with the property for the benefit of another person." 1 A. Scott, Law of Trusts § 24, at 192 (3d ed. 1967); see Restatement (Second) of Trusts § 2 (1959). "To determine whether there is a trust we are to look, not at the title given, but at the powers and duties conferred." *Sheets' Estate*, 52 Pa. 257, 266 (1866). See *McClain Estate*, 435 Pa. 408, 411, 257 A.2d 245, 246-47 (1969); *Schuldt v. Reading Trust Co.*, 270 Pa. 360, 363-64, 113 A. 545, 547 (1921).

This Court in *Vosburgh's Estate*, 279 Pa. 329, 123 A. 813 (1924), provided specific guidance for the resolution of the question whether the parties intended to create a trust. There we held that "[a] trust is a relation between two persons, by virtue of which one of them as trustee holds property for the benefit of the other. The term 'trust' is a very broad and comprehensive one. Every deposit is a trust, except possibly general bank deposits; every person who receives money to be paid to another or to be applied to a particular purpose is a trustee . . . ." Id. at 332, 123 A. at 815. Accord, *In re Interborough Consol. Corp.*, 288 F. 334, 347 (2d Cir.), cert. denied, 262 U.S. 752, 43 S. Ct. 700 (1923); *Andrew v. Union Savings Bank & Trust Co.*, 220 Iowa 712, 715, 263 N.W. 495, 497 (1935); *Carpenter v. Suffolk Franklin Savings Bank*, 291 N.E. 2d 609 (Mass. 1973). See 1 A. Scott, Law of Trusts § 24, at 192 (3d ed. 1967). Appellants, having sufficiently alleged the creation of a trust,[9] must be afford-

---

[9] One personal bond agreement provides that "the monthly payments made by Obligor shall be applied first to interest and premium on the unpaid balance of the principal sum and the remainder thereof shall be credited on account of said sum, and (except when taxes are paid to the Obligee in monthly installments) shall also well and truly pay all taxes . . . which are now and also all those which may hereafter be assessed . . . ." Bond from E. Joseph & Margaret K. Charny to Wilkinsburg Federal Savings

ed the opportunity to prove that money was paid to a mortgage lending institution for the specific purpose of satisfying tax and other obligations.[10]

Recently, the Supreme Judicial Court of Massachusetts was confronted with a similar issue and held, as we do, that appellants' complaint sufficiently put in issue the creation of a trust. *Carpenter v. Suffolk Franklin Savings Bank*, 291 N.E.2d 609 (Mass. 1973).[11] There, plaintiffs likewise challenged the practice of

---

& Loan Ass'n (now West Penn Federal Savings & Loan Ass'n), July 30, 1968.

[10] On remand, appellants must prove all elements of a trust. See *Thompson Will*, 416 Pa. 249, 254-55, 206 A.2d 21, 25 (1965); Restatement (Second) of Trusts § 2 (1959).

The trial court concluded that "[n]owhere . . . do the documents contain any language defining the *res* of such a trust." This conclusion was reached without reference to the specific language of any agreement and without citation to any authority. Preliminarily, it appears that the court did not consider each agreement individually; this alone requires reversal. On remand, the trial court should be aware when determining whether there is a trust subject matter, that "[i]t is the identity of the fund, not of the pieces of coin or bank note that, controls . . . ." *Vosburgh's Estate*, 279 Pa. 329, 333, 123 A. 813, 815 (1924). To establish a trust subject matter, appellants must only prove the amount of monthly payments tendered to their mortgage lending institution. See *Mehler's Appeal*, 310 Pa. 25, 29, 164 A. 619, 620 (1932); *Trestrail v. Johnson*, 298 Pa. 388, 396-97, 148 A. 493, 495 (1929); *Webb v. Newhall*, 274 Pa. 135, 136-37, 117 A. 793, 793 (1922); *Farmers' & Mechanics' Nat'l Bank v. King*, 57 Pa. 202 (1868). See generally Restatement (Second) of Trusts §§ 74, 76 (1959); 1 A. Scott, Law of Trusts § 76 (3d ed. 1967).

[11] Appellees have cited several cases which they claim reject the argument that mortgagees are liable to their mortgagors for profits earned on monthly tax payments. Where the issue was squarely presented, the cases are distinguishable because of differences in the language used in the mortgage agreements. E.g., *Sears v. First Federal Savings & Loan Ass'n*, 1 Ill. App. 3d 621, 275 N.E.2d 300 (1971); *Richman v. Security Savings & Loan Ass'n*, 57 Wis. 2d 358, 204 N.W.2d 511 (1973). Other cases cited by appellees are inapposite either because the court's discussion of whether the mort-

mortgagees investing for their own account the monthly tax payments of mortgagors. The Massachusetts Su-

gagor was entitled to interest was not necessary to its decision, *Tucker v. Pulaski Federal Savings & Loan Ass'n*, 252 Ark. 849, 481 S.W.2d 725 (1972), or because the court did not even consider the question. *Schechtman v. Grobbel*, 226 So. 2d 1 (Fla. Ct. App. 1969).

The Illinois intermediate appellate court in *Sears* sustained the dismissal of the complaint. Initially, the court noted that "the controversy centers about certain language in the note . . . ." Id. at 625, 275 N.E.2d at 302. The mortgage agreement expressly granted the mortgagee the right to choose from three options how it would hold the monthly tax payments. The mortgagee chose to use the second option. Mortgagors alleged that the parties' agreement intended that the tax payments held by the mortgagees under the second option were held in trust. However, the first option specifically provided that the monthly payments were to be held in trust without earnings. The *Sears* court reasoned that the second option could not reasonably restrict the mortgagee to any greater extent than the first option. Therefore, if the second option was considered a trust, it would be identical in effect to the first, and accordingly deprive the mortgagee of any meaningful contractual choice. Id. at 629, 275 N.E.2d at 305. The record in the instant case fails to show any mortgage or personal bond agreement that specifically allows, as did the *Sears* mortgage, a mortgage lending institution the option of choosing how to "hold" the monthly tax payments.

Although the court in *Richman* affirmed the dismissal of the complaint, the case is distinguishable. The mortgage agreement in that case provided "that payments for taxes and insurance may be held by the defendant, commingled with other funds or its own, and that the defendant as the mortgagee is not obligated to pay interest to the mortgagors on the funds." Id. at 362, 204 N.W.2d at 513. There is nothing in the pleadings of any of the parties to indicate that any mortgage agreement in the present case expressly allowed a mortgagee to commingle the monthly tax payments with its own funds.

In *Schechtman v. Grobbel*, the court was not confronted with the question whether the mortgagor was entitled to an accounting. There, although the mortgagees required the mortgagor to make monthly tax payments to them, the mortgagee refused and instead deposited the tax money in a special account. The court denied the mortgagees' action for a foreclosure on the ground that the security

preme Judicial Court reversed the trial judge's dismissal of plaintiffs' complaint for failure to state a cause of action, because it believed that from the facts pleaded plaintiffs could establish the creation of a trust. It is true that the Massachusetts court did not have before it the written instruments but depended on what the parties pleaded as the legal effect of the documents. Nevertheless, the Massachusetts court chose a standard identical to ours for the trial court to apply on remand.

"Where the mortgagor pays funds to a bank with an expressed purpose that the funds shall be used for a particular purpose, then the funds may be deemed to be held in trust." 291 N.E.2d at 614. The court had no difficulty in deciding the legal effect of mortgagors' paying installments to the bank in order for the bank to be certain the mortgagors were fulfilling their obligation to pay all taxes on the real estate. "We think it is clear from the bill that the tax payments were designated by the mortgagors for a specific purpose, namely to pay the real estate taxes." 291 N.E.2d at 614.

---

under the mortgage was not at any time jeopardized. By denying foreclosure, the court permitted the mortgagor the interest earned on his monthly tax payments.

The court in *Tucker* reversed the trial court's judgment permitting the bank to accelerate and foreclose. The bank had brought a foreclosure action against its mortgagor for conveying the property without its consent. Defendants were both the mortgagor-vendor and the vendee. They filed a class action seeking a counterclaim for the interest earned on monthly tax payments held by the bank. The court first disagreed sharply with the procedure employed by appellants; a class action was entirely beyond the scope of Arkansas's counterclaim statute. In fact, the vendee did not even make monthly tax payments. Although the court concluded without citation to authority and without explanation that it disagreed with defendants' claim, the remark was gratuitous and dictum. Id. at 858-59, 481 S.W.2d at 731.

Here, the trial court improperly denied appellants the opportunity to prove their claim. Appellants have pleaded facts sufficient to put in issue the creation of a trust, since they have alleged that they made monthly payments for the satisfaction of tax and other assessments pursuant to a contractual provision.

Reversal of this portion of the trial court's decree also is required because this Court cannot say with assurance that the trial court considered each mortgage and bond agreement individually[12] when it concluded that appellants could not establish in any circumstance the existence of a trust relationship.[13] Our review of

---

[12] The trial court in a note to its opinion stated that "[t]o facilitate discussion, we will treat, where possible, the case as though only one Plaintiff and one Defendant were involved." Although this approach might be possible in some circumstances, it is not desirable where the resolution of questions of law that are advanced by the parties depends upon the precise language used in the parties' agreements.

[13] For example, the trial court concluded that a debtor-creditor relation was envisioned by the parties, because the agreements used the word "pay" to describe the mortgagors' obligation to deliver the monthly tax payments to appellees. However, not all mortgage and bond agreements in the record use the word "pay"; some require the mortgagor to "deposit" the tax payments, others direct him to "advance" the sums.

For the use of the word "deposit," see Mortgage Note from Martin W. & Evelyn G. Sapper to The Dollar Savings Bank, May 9, 1962; Mortgage Note from Walter E. & Irene S. Ellman to The Dollar Savings Bank, September 21, 1962. For agreements requiring the mortgagor to "advance," see Bond from Joseph P. & Susan V. Meyers to Franklin Federal Savings & Loan Ass'n of Pittsburgh, January 13, 1969; Bond from Roger E. & Dorothy S. Buchanan to Franklin Federal Savings & Loan Ass'n of Pittsburgh, October 16, 1968; Bond from David M. & Laurel Burstin to Franklin Federal Savings & Loan Ass'n of Pittsburgh, February 2, 1968. But see Bond from Meyer & Helen Gisser to Friendship Federal Savings & Loan Ass'n of Pittsburgh, October 29, 1963 ("pay").

Although it was alleged that the following persons executed mortgage and personal bond agreements with the following mortgage

the record discloses substantial differences in the language used in the mortgage and bond agreements. Each class or type of agreement must be considered separately because these variations may be crucial to the correct assessment of what relationship the parties contemplated.

The trial court also found that the parties' agreements manifested a debtor-creditor relation. Although again it is unclear whether the trial court focused on any particular agreement, its conclusion was based on a mistaken view of the agreements. In the ordinary situation of a bank deposit, a debtor-creditor relation is established, with the depositor being the creditor and the bank, the debtor. Here, the trial court believed that the payments of the monthly sums were in satisfaction of a debt owed by the mortgagor to his mortgage lending institution. However, none of the mortgage and bond agreements in the record speak of a debt in respect to the monthly payments. Moreover, the mortgagees assumed no obligation to be responsible for the payment of the mortgagors' taxes. Rather, according to the contracts, the liability for the payment of all taxes and assessments was at all times the mortgagors'.

In support of the trial court's conclusion, appellees urge that the sole interpretation that can be given to the use of the word "pay" in the agreements is that the parties intended a debtor-creditor relationship. First, not all of the contracts in the record obligate the mortgagor to "pay." Second, we are not bound at the demurrer stage to accept such a hypertechnical reading

---

lending institutions, the record does not contain the agreements between these parties: Richard & Marcia Raphael with Franklin Federal Savings & Loan Ass'n of Pittsburgh; Alexander & Marvia M. Stavrides with Mellon Nat'l Bank & Trust Co.; Max R. & Marjorie Stone with Century Federal Savings & Loan Ass'n of Pittsburgh; Leonard S. & Margaret Kisslinger with Mellon Nat'l Bank & Trust Co.; Alan & Marion Reznick with The Dollar Savings Bank.

of a particular word in some of the agreements. When an agreement is read as a whole, it may become apparent that the word "pay" was used generically to mean tender, hand over, or deliver. Finally, the legal effect of the parties' undertaking must be determined by viewing an agreement in its entirety.[14]

An alternative argument is advanced to justify the contention that the profits earned on the monthly tax payments should rightfully be returned to appellants. If an express trust was not created, then the earnings should be impressed with a constructive trust. The trial court sustained appellees' demurrer to this allegation on the ground that appellants failed to allege fraud in the transaction. We hold that appellants' allegations were sufficient to withstand the demurrer.[15]

This Court has many times adopted Professor Scott's definition of a constructive trust.

"A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it."

[14] That no interest was paid on the monthly payments is a circumstance to be considered by the trial court on remand. This Court has stated that the "imposition [of interest on money held by a bank] implies a debtor-creditor and not a trustee-beneficiary relation." *Bair v. Snyder County State Bank*, 314 Pa. 85, 90, 171 A. 274, 275 (1934). The absence of interest being paid on the escrow monies held by mortgage lending institutions may evidence a trustee-beneficiary relationship. See *Barr v. Luckenbill*, 351 Pa. 508, 511, 41 A.2d 627, 628-29 (1945); Restatement (Second) of Trusts § 12, Comment g, at 37-38 (1959); 1 A. Scott, Law of Trusts § 12.2 (3d ed. 1967); *Wilbur Trust Co. v. Knadler*, 322 Pa. 17, 20, 185 A. 319, 321 (1936); *Pittsburgh Nat'l Bank of Commerce v. McMurray*, 98 Pa. 538 (1881).

[15] Although the existence of fraud may be sufficient justification for finding a constructive trust, it is by no means necessary. 5 A. Scott, Law of Trusts §§ 462, 465-73 (3d ed. 1967); Restatement of Restitution §§ 160, 163-71 (1937); *Dubin Paper Co. v. Insurance Co. of North America*, 361 Pa. 68, 85-88, 63 A.2d 85, 94-95 (1949).

5 A. Scott, Law of Trusts § 462, at 3413 (3d ed. 1967) (footnote omitted). See *Chambers v. Chambers*, 406 Pa. 50, 54-55, 176 A.2d 673, 675 (1962) ; *Mellon National Bank & Trust Co. v. Esler*, 357 Pa. 528-29, 55 A.2d 327, 328 (1947) ; *Gray v. Leibert*, 357 Pa. 130, 135, 53 A.2d 132, 135 (1947).

A constructive trust, it has often been said,[16] is not really a trust at all but rather an equitable remedy. Like all remedies in equity, it is flexible and adaptable.[17] Changing times and circumstances create different problems for society and present new questions to the courts.[18] And equity has never been reluctant to right injustices or to correct societal ills. Justice CARDOZO, while a judge on the New York Court of Appeals, recognized the flexibility and growing power of constructive trusts.

---

[16] E.g., Restatement (Second) of Trusts § 1, Comment e (1959) ; Restatement of Restitution § 160 (1937) ; 5 A. Scott, Law of Trusts § 462.1 (3d ed. 1967).

[17] See 1 J. Pomeroy, A Treatise on Equity Jurisprudence § 111, at 143-44 (5th ed. S. Symons 1941) (footnote omitted).

"Equity has followed the true principle of contriving its remedies so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated. It has, therefore, never placed any limits to the remedies which it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." See *Peoples-Pittsburgh Trust Co. v. Saupp*, 320 Pa. 138, 146, 182 A. 376, 379-80 (1936).

[18] It has long been recognized that equity's task is to provide remedies where none exist but are needed.

"It must not be forgotten that in the increasing complexities of modern business relations equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them." *Union Pacific Ry. v. Chicago, R.I. & P. Ry.*, 163 U.S. 564, 601, 16 S. Ct. 1173, 1187 (1896).

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380-81 (1919). See, e.g., *Truver v. Kennedy*, 425 Pa. 294, 305, 229 A.2d 468, 474 (1967); *Chambers v. Chambers*, 406 Pa. 50, 54-55, 176 A.2d 673, 675 (1962). The expression "converts him into a trustee" is not strictly accurate because a constructive trustee is not bound by all the duties of a trustee of an express trust. 5 A. Scott, Law of Trusts § 462, at 3413 (3d ed. 1967). Rather, the sole responsibility of a constructive trustee is to surrender the property to the one on whose behalf the constructive trust is raised. Id.; see *Pierro v. Pierro*, 438 Pa. 119, 127, 264 A.2d 692, 696 (1970); *Peoples-Pittsburgh Trust Co. v. Saupp*, 320 Pa. 138, 182 A. 376 (1936). A constructive trustee "is not compelled to convey the property because he is a constructive trustee; it is because he can be compelled to convey it that he is a constructive trustee." 5 A. Scott, Law of Trusts § 462, at 3413 (3d ed. 1967).

The question whether a constructive trust is to be imposed on the profits earned by the investment by the mortgage lending institutions of appellants' monthly tax payments can be resolved only by answering the more fundamental question whether "the conscience of equity" would conclude that the mortgagees would be unjustly enriched were they permitted to keep the funds.

It is rare that the existence or absence of justification for imposing an equitable remedy, especially a constructive trust, can be decided as a matter of law. Only after all the facts are before a court, can it in most cases properly determine the issue. To introduce the issue of constructive trust a plaintiff must allege that the

putative trustee had legal title to the property, and that were he to retain it, he would be unjustly enriched. The allegations of appellants' complaints sufficiently put in issue these questions.

To convince "the conscience of equity" that a constructive trust should be imposed on the profits earned by mortgagees' investment of the monthly tax payments, appellants advance three theories. First, it is asserted that in the particular circumstances of these contracts, the mortgagor and mortgagee stood in confidential relation with each other. The existence, if proved, of a confidential relationship is sufficient justification for imposing a constructive trust, unless the dominating party can prove "by clear and satisfactory evidence," see *Kees v. Green,* 365 Pa. 368, 375, 75 A.2d 602, 605 (1950) (citing cases), that the contract was not tainted by his overweening bargaining position. A confidential relation may be found as a matter of law, see *Truver v. Kennedy,* 425 Pa. 294, 305-07, 229 A.2d 468, 474 (1967), but more often it is a matter of fact to be established by the evidence. E.g., *Drob v. Jaffe,* 351 Pa. 297, 300, 41 A.2d 407, 408 (1945). See Restatement (Second) of Trusts § 2, Comment b (1959).

Standards in some of our earlier cases furnish guidelines for deciding whether a constructive trust ought to be imposed. The intent of the parties is not controlling, and in many cases in which a constructive trust is raised, it is imposed despite the parties' intent. See *Gray v. Leibert,* 357 Pa. 130, 135, 53 A.2d 132, 135 (1947); 5 A. Scott, Law of Trusts § 462.1 (3d ed. 1967). The evil to be avoided is unfairness and inequality in bargaining or dealings between parties.[19]

---

[19] Appellees claim that inequality of bargaining power is insufficient to establish a confidential or fiduciary relation. To support this assertion, they cite a single case, *Spens v. Citizens Federal Saving & Loan Ass'n,* 364 F. Supp. 1161 (N.D. Ill. 1973), which is inapposite. The plaintiffs in *Spens* alleged several federal claims

See *Hamberg v. Barsky*, 355 Pa. 462, 465, 50 A.2d 345, 346-47 (1947). However, "[n]o precise language can define the limits of the relation or fetter the power of the court to control these conditions." *Leedom v. Palmer*, 274 Pa. 22, 25, 117 A. 410, 411-12 (1922).[20]

Next, appellants urge that a constructive trust is a proper remedy because appellees agreed to act as their agents, and in contravention of an agent's duties, used appellants' monies to generate profits for their own account. If appellants prove on remand that the agreement contemplated an agency relation, then they may prevail on this theory.[21] An agent, unless authorized, may not use his principal's money for his own advantage. Restatement (Second) of Agency §§ 13, 387

for relief and some state pendent claims. Appellees rely on the court's language in *Spens* discussing the claim that mortgagee's failure to disclose to the mortgagor that it received a 10% rebate for prompt payment of fees to the title insurance companies constituted a breach of trust. The mortgagee required its mortgagors to purchase title insurance through its own operation. More importantly, the federal court's reflections on Illinois law were dictum since it expressly dismissed the state claims for failure to meet the requirements of pendent jurisdiction.

As evidence of unequal bargaining position, lack of competition is probative. A party's bargaining hand is strengthened if all those who sell (or buy) substantially the same product or goods do so on substantially identical terms.

[20] That equity has expansive power to control unfairness and inequality cannot be gainsaid. See *Kees v. Green*, 365 Pa. 368, 374-75, 75 A.2d 602, 605 (1950); *Shook v. Bergstrasser*, 356 Pa. 167, 170, 51 A.2d 681, 682 (1947); *Hamberg v. Barsky*, 355 Pa. 462, 465-66, 50 A.2d 345, 346-47 (1947); *Drob v. Jaffe*, 351 Pa. 297, 300, 41 A.2d 407, 408 (1945).

[21] Of course, since agency is a contractual relation, the parties may offer evidence to prove that their agreement did (or did not) contemplate the exercise of certain powers. "The existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties, interpreted in light of circumstances under which it is made . . . ." Restatement (Second) of Agency § 376 (1958).

(1958). If he does, a court may appropriately decree the equitable remedy of a constructive trust and command that the mortgagee-agent return the profits wrongfully earned to the mortgagors. *Kribbs v. Jackson,* 387 Pa. 611, 618-19, 129 A.2d 490, 494 (1957). See Restatement (Second) of Agency § 388 (1958). On remand appellants will have the opportunity to prove that there was a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Id.* § 1(1). See *Chalupiak v. Stahlman,* 368 Pa. 83, 88, 81 A.2d 577, 580 (1951).

Third, appellants assert that appellees will be unjustly enriched if they are permitted to retain the earnings from the monthly tax payments. See *Truver v. Kennedy,* 425 Pa. 294, 229 A.2d 468 (1967); *Gray v. Leibert,* 357 Pa. 130, 53 A.2d 132 (1947). This is in effect a general assertion that the ends of public policy and substantial justice demand that a constructive trust be impressed on the earnings. It is well settled that a constructive trust will arise whenever justice or the need for fair dealing warrants it. See *Peoples-Pittsburgh Trust Co. v. Saupp,* 320 Pa. 138, 182 A. 376 (1936); *Philadelphia v. K.C. Construction Co.,* 11 Bucks County L.J. 285 (Pa. C.P. 1961). Appellants are to be given the chance to offer evidence that would convince "the conscience of equity" that the retention by the mortgage lending institutions of the profits earned on the monthly payments would result in unjust enrichment.

## II.

Appellants next seek to recover the increased interest they have allegedly been forced to pay as a result of appellees' breach of an implied contract. Appellants claim that at the time some of them entered into mortgage agreements, some of the appellees capitalized the

monthly tax payments. The capitalization of the monthly tax payments by the mortgage lending institutions at the time the contracts were consummated together with the language in the written instruments give rise to an implied contract to continue the practice. When appellees subsequently and unilaterally abandoned capitalization in favor of the currently-employed system of maintaining escrow accounts, they breached the implied contract. Appellants claim they were injured because under the newer escrow system their total monthly payments (for principal, interest, and taxes) are greater than they were when appellees capitalized the tax payments.

The trial court held that appellants failed to state a cause of action because there was no language in any of the contracts from which a contract to capitalize could be implied. Our review of the mortgage and loan agreements reveals that in some the parties have referred without clarity to the manner in which the mortgage lending institutions would deal with the monthly tax payments. For example, one mortgage agreement[22] is

_____

[22] Mortgage from Joseph P. & Susan V. Meyers to Franklin Federal Savings & Loan Ass'n of Pittsburgh, January 13, 1969. That mortgage provides, inter alia, that "[t]he amount of said monthly payment for taxes shall become part of the amount required to be paid monthly by said Mortgagor(s) under the terms and conditions of this obligation." The mortgage instrument continues and states:

"The aggregate of all such monthly payments hereinbefore provided for all [sic] be paid by the Mortgagor each month in a single payment to be allocated by the Mortgagee to the following items in the order set forth:

"I. Taxes, governmental levies, assessments, sewer and water rents, fire and other hazard insurance;

"II. Interest on said Bond; and

"III. Amortization of the principal secured thereby."

Other mortgages contain the same conditions. E.g., Mortgage and Bond from Roger E. & Dorothy S. Buchanan to Franklin Federal Savings & Loan Ass'n of Pittsburgh, October 16, 1968; Mortgage

capable of the interpretation that all payments, whether for principal, interest, or taxes, are to be treated identically and as a unit. Appellants must not by the sustaining of the demurrer be denied the opportunity of proving that the monthly tax payments were intended by the parties to be capitalized. Because this Court cannot conclude with certainty that the trial court considered each mortgage and loan agreement separately,[23] we must remand for a determination whether a contract to capitalize can be implied from the language of the written instruments.[24]

and Bond from David M. & Laurel Burstin to Franklin Federal Savings & Loan Ass'n of Pittsburgh, February 2, 1968.

[23] See text accompanying notes 12-13 supra.

[24] On remand, the trial court will be confronted with the task of interpreting the agreement between the parties. "In order to determine the meaning of the agreement, [the trial court] must examine the entire contract since it is well settled that in construing a contract the intention of the parties governs and that intention must be ascertained from the entire instrument taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view and the nature of the subject matter." *Mather Estate*, 410 Pa. 361, 366-67, 189 A.2d 586, 589 (1963) (interpretation of written stock option agreement). See *Silverstein v. Hornick*, 376 Pa. 536, 540, 103 A.2d 734, 737 (1954) ; *Betterman v. American Stores Co.*, 367 Pa. 193, 203-04, 80 A.2d 66, 73 (1951) ; *Percy A. Brown & Co. v. Raub*, 357 Pa. 271, 287, 54 A.2d 35, 43 (1947) ; *Slonaker v. P.G. Publishing Co.*, 338 Pa. 292, 296, 13 A.2d 48, 50-51 (1940).

As long ago as 1830 this Court recognized what inquiry was necessary for proper interpretation of a contract.

"In expounding an agreement we must consider the subject-matter ; the object of making it ; the sense in which the parties mutually understood it at the time it was made ; the place where it was entered into ; . . . and finally, the practical exposition and the general understanding, custom, and usage amongst those who enter into similar contracts, in the execution and performance thereof. The construction must be reasonable ; and the intention of the parties, if it can be collected from the instrument, and an attentive consideration of the circumstances always adverted to, with such

### III.

Appellants' final claim is that the mortgage lending institutions are violating the Truth in Lending Act, 15 U.S.C.A. §§ 1601-65 (Supp. 1973). The violation, it is alleged, occurs by reason of appellees' failure to accurately compute the statutorily-mandated annual percentage rate. Id. § 1606. Being a disclosure mechanism, the Truth in Lending Act sought to compel lending institutions to disclose to their borrowers the effective rate of interest on a loan. Id. § 1601. To this end, Congress devised the annual percentage rate which is computed, in simplest form, by dividing the amount financed into the finance charge, id. § 1605; 12 C.F.R. § 226.4 (1973), and multiplying the quotient obtained by 100.

Appellants assert that the monthly tax payments are a "deposit balance . . . which the creditor requires the customer to . . . maintain . . . in a specified amount . . . as a condition to the extension of credit . . . ." 12 C.F.R. § 226.8(e)(2) (1973). Required deposit balances must be deducted from the amount financed and disclosed separately.[25] Id. § 226.8(e). Appellees have

---

others as may be incident to the nature and character of the particular contract, must control every other construction inconsistent with it, unless repugnant with some settled principle of law." *Roberts v. Beatty*, 2 Pen. & W. 63, 65-66 (Pa. 1830). See also 1 A. Corbin, Contracts §§ 538-39, 542 (1960); Restatement (Second) of Contracts §§ 239, 240(b), (c), 242(2)(b) (Tentative Draft No. 6, 1971).

[25] The rationale of excluding required deposit balances from the amount financed is that they are in effect a pro tanto reduction of the amount financed. The borrowers do not have the use of the required deposit balances for the term of the loan. Correspondingly, the amount of money actually loaned (borrowed) is decreased.

Were the monthly tax payments deemed to be required deposit balances, their exclusion from the amount financed would increase the annual percentage rate. As the dividend (amount financed) is

not deducted the monthly payments from their computation of the amount financed. They support their practice by arguing that the monthly payments fall within a specific exception from the definition of required deposit balances. The claimed exception is for "[a]mounts required to be placed or paid into an escrow or trustee account for future payment of taxes, insurance, and water, sewer, and land rents." Id. §§ 226.8(e)(2)(i), 226.4(e)(3). See 15 U.S.C.A. § 1605(e)(3) (Supp. 1973).

The dispute, in short, is whether the monthly tax payments are "escrows" as that term is used in the Truth in Lending Act.[26] The issue, however, has already been disposed of adversely to appellants. *Stavrides v. Mellon National Bank & Trust Co.*, 353 F. Supp. 1072 (W.D. Pa.), aff'd, 487 F.2d 953 (3d Cir. 1973) (per curiam). See *Graybeal v. American Savings & Loan Ass'n*, 59 F.R.D. 7, 18-20 (D.D.C. 1973); *Kinee v. Abraham Lincoln Federal Savings & Loan Ass'n*, 365 F. Supp. 975 (E.D. Pa. 1973); *Munn v. American General Investment Corp.*, 364 F. Supp. 110 (S.D. Tex. 1973). See also *Williams v. American Savings Ass'n*, No. CA-3-6350-D (N.D. Tex., March 26, 1973); *Umdenstock v. American Mortgage & Investment Co.*, 363 F. Supp. 1375 (W.D. Okla. 1973).

## IV.

Remaining for consideration are significant procedural questions. First, may the present action appro-

---

decreased while the divisor (finance charge) remains constant, the quotient (annual percentage rate) will naturally be greater. Hence, the alleged violation.

[26] Congress expressly delegated to the Board of Governors of the Federal Reserve System the authority to prescribe regulations to fulfill the Truth in Lending Act's purposes. 15 U.S.C.A. § 1604 (Supp. 1973).

priately proceed as a plaintiff class action? Pa. R.C.P. 2230.[27] Second, may it proceed as a defendant class action?

If the present action is to continue as a plaintiff class action, the court on remand must limit each class of plaintiffs to those holding mortgage and personal bond agreements having monthly tax payment clauses[28] that do not differ materially. As to this limited group, two further questions must be answered. It must be determined whether the group of mortgagees who hold such instruments "are so numerous as to make it impracticable to join all as parties." And the trial court must be satisfied that the named plaintiffs "will adequately represent the interest of all." These questions are called to the attention of the trial court so that a record adequate for determination there as well as for appellate review may be established. We recognize that the resolution of these issues by the trial court may possibly result in a number of separate class actions, each appropriately confined.

Appellants named in their complaints thirty-two defendants and "other unknown banking institutions and savings and loan associations doing business in Allegheny County, Pennsylvania." Appellants' treatment as a class of these named and "other unknown" defendants seems improper. The existence of independent contracts with substantially different provisions regarding

[27] Rule 2230 of the Pennsylvania Rules of Civil Procedure provides:

"(a) If persons constituting a class are so numerous as to make it impracticable to join all as parties, any one or more of them who will adequately represent the interest of all may sue or be sued on behalf of all, but the judgment entered in such action shall not impose personal liability upon anyone not a party thereto.

"(b) An action brought on behalf of a class shall not be dismissed, discontinued, or compromised nor shall a voluntary nonsuit be entered therein without the approval of the court in which the action is pending."

[28] See note 2 supra.

monthly tax payments precludes the finding of a permissible defendant class under rule 2230.

Nothing in our opinion is to suggest that when the several class actions are ready for trial, the parties and the court may not devise procedural methods for the prompt, efficient, and equitable disposition of appellants' claims.

That portion of the trial court's decree that dismissed appellants' complaints for failure to state a cause of action under the Truth in Lending Act is affirmed. In all other respects the decree of the Court of Common Pleas of Allegheny County is reversed, and the case remanded for proceedings consistent with this opinion. Each party pay own costs.

Mr. Chief Justice JONES concurs in the result.

---

CONCURRING OPINION BY MR. JUSTICE EAGEN:

I join in the order remanding this case for further proceedings because, and only because, the facts alleged in the complaint, if proven, may be sufficient to establish a constructive trust.

Mr. Chief Justice JONES joins in this concurring opinion.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE POMEROY:

This case presents a procedural tangle which should be straightened out before the Court decides the difficult substantive questions as to whether a cause (or causes) of action has been stated.

The case is brought by 29 plaintiffs (13 sets of husbands and wives and three individuals) on behalf of themselves and others similarly situated against 31 lending institutions "and other unknown banking institutions and savings and loan associations doing business in Allegheny County, Pennsylvania". Some, but not all, of the named defendants filed preliminary objections to

the amended complaint and, also, to a second amended complaint by which a fourth count was added.

The preliminary objections included, *inter alia*, (1) a demurrer and (2) an assertion that the complaint failed to state a proper class action because (among other reasons) "the questions of law or fact involved are not common to all the plaintiffs or proposed members of the class".

The court en banc below sustained the demurrers and dismissed the complaint. From that decree, ten separate appeals have been brought to this Court. Motions to quash have been filed, which the Court has denied. I must disagree.

Not all of the named plaintiffs are included among the appellants, and not all the named defendants are among the appellees. In each appeal, the appellants are different persons, and this is true also of the appellees, although one appellee is named as such in two appeals. While there is discernible a pattern in these appeals of grouping plaintiffs who are mortgage borrowers from a particular lending institution as appellants from the "orders" in favor of their respective lending institutions, this is not consistently the case.[1] Whatever rationale may have lain behind the manner in which these appeals were taken, it seems clear that they do not comport with proper appellate practice. Where more than one judgment or appealable order is entered below, we have held that the aggrieved parties may not file only a single appeal; they should appeal from each

---

[1] For example, none of the named plaintiffs is alleged to have any lending arrangements with defendant Union National Bank, yet that institution is named as appellee in the appeal of Kisslinger, et ux. and Stavrides, et ux. at No. 130. Three other named defendants are also designated as appellees in that appeal, as are "other unknown banking institutions doing business in Allegheny County, Pennsylvania". One transaction—that between the Raphaels and Franklin Federal Savings & Loan Association—is not involved in any appeal.

judgment or order which binds them. *See Stewart v. Chernicky,* 439 Pa. 43, 58 n. 15; *General Electric Credit Corp. v. The Aetna Casualty and Surety Co.,* 437 Pa. 463, 469, 470, 263 A.2d 448 (1970). By the same token, it would seem that where, as here, a single order or decree has been entered dismissing a complaint because it does not state a cause of action, there should be but a single appeal.[2] Without passing on the class action challenge, this case was treated by the court below as a class action for purposes of the demurrer, and for procedural purposes, the plaintiff class is to be treated as a single party.[3]

I am unable to find authority for the appeal procedure here followed, *i.e.,* groups of selected plaintiffs as appellants, adverse to groups of selected defendants as appellees; this is neither fish nor fowl nor good red herring. In the interest of orderly and intelligent appellate review, therefore, I would grant the motion to quash the appeals.[4]

---

[2] This procedure was followed in *Kern v. Duquesne Brewing Co.,* 396 Pa. 279, 152 A.2d 682 (1959), where the Court affirmed the sustaining of a demurrer in a purported class action in equity at 17 D. & C. 2d 299 (C.P., Allegheny County, 1958).

[3] Had this action been brought under the permissive joinder provisions of the Rules of Civil Procedure, *see* Pa. R. C. P. 2229, the result would be different. In such a case, the plaintiffs should bring separate appeals from the respective decrees against them. *Clark v. Clark,* 411 Pa. 251, 252 n. 2, 191 A.2d 417 (1963); Pa. R. C. P. 2231(d).

While argument can be made, as appellees at Nos. 123 and 130 have done, that the complaint here must be viewed as one of permissive joinder, and that the single decree must be treated as multiple, thus requiring separate appeals, this argument seems forced at this stage of the proceeding. The court en banc's use of the plural in its decree, *viz.,* that "the *several complaints* are dismissed" (584a), cannot be given so much weight.

[4] Were this to be done, the order granting the motion should, in my opinion, state that it is without prejudice to the filing of a proper appeal within 30 days of the date of the order.

Since the Court has not seen fit to quash, I feel it desirable to address briefly the merits of the appeals. One reason which the majority opinion gives for reversal is "because this Court cannot say with assurance that the trial court considered each mortgage and bond agreement individually when it concluded that appellants could not establish in any circumstance the existence of a trust relationship". (Opinion of the Court, *supra*, p. 148; *see also* notes 12 and 13, and note 10, second paragraph.) The opinion then states that there are substantial differences in the language of the instruments (which the Court apparently considers as properly part of the record),[5] and that "these variations may be crucial to the correct assessment of what relationship the parties contemplated". (Opinion, p. 149.) In light of these statements, I cannot understand how the Court can nevertheless hold, in sweeping and

---

[5] The complaint does not "state specifically whether any claim . . . set forth therein is based upon a writing", as stipulated by Pa. R. C. P. 1019(h), a requirement of long standing in equity actions as well as in actions at law. Pa. R. C. P. 1501. Although it seems obvious that bonds and mortgages which plaintiffs have executed and delivered to some of the defendants are the basis of the claims, neither the writings nor the material parts thereof were attached to the complaint, this omission also being in violation of our rule. No objection was raised to these pleading irregularities by defendants. Instead, the preliminary objections attached copies of a number of the bonds and mortgages referred to in certain transactions, of which eighteen were listed in paragraph 5 of the amended complaint, but, as the opinion of the Court points out (*see* footnote 13, p. 148, *supra*), the documents relative to five listed transactions were not included, nor were the instruments made part of the preliminary objections. The plaintiffs did not file answers to the preliminary objections, and the record thus contains no express indication that the documents are accepted as true and complete copies. About the only thing that can be said with assurance is that the copies of bonds and mortgages as they are reproduced in the printed record before the Court are in large measure illegible. The ambiguity of the record as to the instruments involved contributes materially to the tangled status of the case as it comes to us.

all-inclusive fashion, that appellants "sufficiently alleged the creation of a trust". (Opinion, p. 144.)

On the other hand, I cannot, looking only at the complaint, conclude that there is not enough alleged to make out a cause of action on the theory of a constructive trust. The plaintiffs have alleged the payment of so-called escrow funds to defendants, calculated in terms of amounts necessary to pay taxes, assessments and fire insurance premiums applicable to their respective real estate holdings; a commingling of these escrow payments with general funds of the defendants; the receipt by defendants of earnings on those funds; a failure to pay or account to plaintiffs for those earnings; and an appropriation by the defendants of the earnings to their own use, as a result of which they have been unjustly enriched. While the propriety or impropriety of this conduct, like the existence of express trusts, may be in large measure dependent on the terms of the agreements, oral or written, between the parties, the complaint as it stands states a cause of action.[6]

In *Schott v. Westinghouse Electric Corp.*, 436 Pa. 279, 259 A.2d 443 (1969), where we held that the plaintiff had stated a cause of action in quasi-contract sufficiently well to get by a demurrer, we stated the familiar rule that preliminary objections should be sustained and a complaint dismissed only in cases which are clear

---

[6] As previously indicated, I think the complaint is deficient for non-compliance with our rules as to the pleading of agreements. I do not express any opinion as to whether, if the agreements were properly made part of the complaint, a cause of action based on breach of a constructive trust would or would not be stated. As we noted in *Schott v. Westinghouse Electric Corp.*, 436 Pa. 279, 290, 259 A.2d 443 (1969), the Court has previously "found the quasi-contractual doctrine of unjust enrichment inapplicable when the relationship between the parties is founded on a written agreement or express contract [citations omitted]". The view expressed in the main text is based on the allegations of the complaint as it now stands.

and free from doubt. As we there put it, "[t]o sustain preliminary objections in the nature of a demurrer, it must appear with certainty that, upon the facts averred, the law will not permit recovery by the plaintiff. Where any doubt exists as to whether or not the preliminary objections should be sustained, that doubt should be resolved by refusing to sustain the objections [citations omitted]". 436 Pa. at 291. In its present status, the case at bar presents, as I see it, serious doubt as to whether the demurrer should have been sustained. I accordingly concur in the reversal of the decree below and the remand for further proceedings.[7]

---

[7] I also agree that, on remand, the trial court should at an early stage address itself to the class action aspects of this case, and concur in the observations contained in part IV of the Court's opinion in this regard. I agree with Judge SILVESTRI of the Court of Common Pleas of Allegheny County, in the thorough discussion of class actions in Pennsylvania contained in his opinion in *McMonagle v. Allstate Insurance Co.*, 122 P. L. J. 107 (1973), that "there should be a determination as early in the proceedings as may be practicable whether an action brought as a class action is to be so maintained". 122 P. L. J. at 112. Indeed, from the vantage point of hindsight, it would have been helpful in the case at bar had the trial court addressed the class action problems raised by the preliminary objections prior to consideration of the demurrer.